**Markham DUFF-SMITH, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 68908.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 16, 1985.

Rehearing Denied Feb. 27, 1985.

Will Gray, Carolyn Garcia, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Karen Zellars, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

THOMAS G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, Sec. 19.03(a)(3). After finding appellant guilty of capital murder, the jury returned affirmative findings to the first two special issues under Art. 37.071(b), V.A.C.C.P. Punishment was assessed at death.

Appellant was convicted, as a party, of murdering his mother, Gertrude Zabolio,[1]

by strangling her with a panty hose for remuneration or the promise of remuneration, namely, proceeds from the estate of Gertrude Zabolio. The killing occurred in Houston on October 15, 1975. According to the State's theory, appellant, acting with specific intent to promote or assist the commission of the offense, solicited, encouraged or directed Walter Waldhauser to commit the offense. Waldhauser in turn solicited Paul MacDonald to commit the offense and MacDonald hired Allen Wayne Janecka who actually strangled the victim.

In his third ground of error, appellant contends that the evidence was insufficient to sustain a conviction for capital murder, because the testimony of accomplice witness MacDonald was uncorroborated on the issue of remuneration.

MacDonald testified that he became friends with Waldhauser in 1971 when Waldhauser worked as a bellhop at a Holiday Inn in Houston. MacDonald was working as a desk clerk for the same hotel.

The two men remained in intermittent contact over the next few years. At a meeting in late summer of 1975, Waldhauser told MacDonald, who was then in the bail bond business, that a friend named Duff needed an estate cleared up so he could get some money. Waldhauser asked MacDonald if he would be willing to commit murder, but MacDonald refused. Waldhauser then asked MacDonald if he could find someone through his bail bond connections to handle the job, and MacDonald promised to see what he could do. Waldhauser later explicitly told MacDonald that an inheritance was involved, that both the husband and wife would be killed, that the husband had to be killed in order for the estate money to pass quickly, and that Duff was a relative of the intended victims.

MacDonald testified that he stalled Waldhauser for several weeks, hoping that needed money from another source would materialize. On one of the occasions when Waldhauser called, Janecka, whom MacDonald had made bond for in the past, was

---

1. The record reflects that Gertrude Zabolio was married to Dow Zabolio.

present. MacDonald asked Janecka if he knew anyone willing to commit a murder. Janecka replied that he had done it before and would do it again.

MacDonald and Janecka agreed to perform the killings for $10,000.00; $6,500.00 to go to Janecka who would actually do the killing and $3,500.00 to MacDonald who would help Janecka plan it.

MacDonald and Janecka received $800.00 up front and another pre-murder payment of several hundred dollars. This money was physically transferred by Waldhauser in the form of cash and checks, but it was "understood," according to MacDonald, that appellant was supplying the funds. MacDonald testified that he gave almost all of this money to Janecka.

Less than a month before the victim died, Waldhauser supplied MacDonald with details about the people to be killed, including their names, address, and habits. Waldhauser also informed MacDonald that the couple usually went to a cafeteria near their River Oaks home for dinner on Wednesday evenings.

An initial Wednesday evening attempt to murder the deceased and her husband was canceled when they failed to go to the cafeteria.

On October 14, 1975, MacDonald called Waldhauser and told him that another attempt would be made the next night. This call was made, according to MacDonald's testimony, to allow Waldhauser and Duff to arrange alibis.

Janecka and MacDonald staked out the Zabolio house on the night of the 15th. The deceased left alone and the men followed her to the cafeteria. Next MacDonald drove Janecka back to the house, dropped him off, and saw him walk toward the backyard. MacDonald then parked and waited for the deceased to return home.

The murder plan called for Janecka to signal MacDonald on the latter's beeper when the job was done. MacDonald was then to call Janecka at the Zabolio house to make sure everything went according to plans, before picking Janecka up.

After waiting approximately two hours, MacDonald received a signal on his beeper. When he called the house, however, Mrs. Zabolio answered. MacDonald phoned Waldhauser who said he would have someone check on the house. Waldhauser called MacDonald back and told him everything looked all right at the house and not to worry because all alibis were in order.

MacDonald determined that the beeper signal was related to his bail bond work. He waited at his office for a call from Janecka, which eventually came. MacDonald picked Janecka up at a service station not far from the Zabolio house.

Janecka told MacDonald that he spent a long period of time at the Zabolio house waiting for Dow Zabolio, the deceased's husband, to return home. The deceased told Janecka that her husband was working late.[2]

According to MacDonald's testimony, Janecka told him that the deceased accepted her imminent death and was not surprised when Janecka revealed that her son was behind the murder.

Janecka also stated that at some time during the evening the deceased's son, Markham Duff-Smith, called his mother. Janecka told MacDonald that he now knew Duff-Smith was the man who arranged the murder.[3]

The next day MacDonald met with Waldhauser and appellant at Alfred's Delicatessen on Stella Link. This was the first time MacDonald had met appellant. MacDonald had been told by Waldhauser to bring some proof that he had committed the murder.

MacDonald brought the deceased's driver's license which Janecka had given him. He testified that he gave the license to

2. In reality, Dow Zabolio was in Austria.

3. Prior to this time, Janecka was informed that the victim's son was paying for the murder but he had not been told that the son was called Duff.

Waldhauser who put it between two fingers, looked at it and made a joke about avoiding fingerprints. Waldhauser gave the license to the appellant who looked at it and put it down on the table, saying nothing.

MacDonald testified that Waldhauser did most of the talking at the meeting. It was agreed that another attempt to kill Dow Zabolio would be made. Either Waldhauser or the appellant mentioned, without contradiction, that Dow Zabolio would make difficult the rapid distribution of the estate's proceeds. MacDonald asked when the remainder of the money would be paid and appellant stated that no more money would be paid until the contract was completed.

Over the next few months Janecka became impatient for his money and threatened MacDonald on several occasions. MacDonald repeatedly told Waldhauser about the threats but no money was forthcoming from any source. Finally, Waldhauser gave appellant's unlisted phone number to MacDonald and suggested that a call to appellant might "shake things up a bit."

MacDonald called appellant, identified himself, and asked if appellant knew who he was. Appellant indicated that he knew MacDonald. MacDonald told appellant about the threats from Janecka and stated that something had to be done about it. Appellant agreed, stating, "Okay we'll get it taken care of." Shortly after this conversation, Janecka received full payment from Waldhauser.

MacDonald never received full payment and in July, 1976, moved with his family to Florida. He never again saw the appellant until the appellant was arrested. While in Florida, MacDonald received two more checks from Waldhauser drawn on a Houston bank account.

All of the foregoing testimonial evidence was provided by MacDonald. The pertinent corroborating evidence was as follows.

L.C. Johnson was the longtime handyman for the Zabolio family who discovered the victim's body sprawled across the bathroom floor. He testified that he had known appellant for years.

Johnson and appellant were out hunting one day on some property owned by the Zabolios. As Dow Zabolio and the deceased drove up in their car, the appellant said to Johnson, "Here comes this damned old bitch. She ought to be dead." When Johnson scolded appellant for saying such a thing, appellant responded, "You just don't know."

Johnson also testified that there were muddy footprints on the floor of the house on the morning he discovered the deceased's body.

Alex Perez had known the appellant since they were both about ten years old. Perez testified that appellant and his mother had argued repeatedly, from the time appellant was in high school until his mother's death, over the subject of money and cars. According to Perez, appellant lived beyond his means and expected his mother to help him out financially since she was able to do so. Appellant became angry when his mother would not give him money.

Perez also testified that appellant was in dire financial straits shortly before his mother died, but had plenty of money to spend on clothes and cars after her death. Appellant told Perez that he and his sister opened the deceased's safety deposit box the day after her death and "got everything out" before it could be sold off by the estate.

Felix Tijerina was another lifelong friend of appellant's. He also testified that appellant and his mother had disagreements concerning money matters. Tijerina confirmed Perez's testimony about appellant's relative financial status before and after the murder. Appellant at one time indicated to Tijerina, whose mother was wealthy, that Tijerina would be financially independent if or when Tijerina's mother was gone. Appellant lived with Tijerina

during the time his mother was killed and for several months thereafter.

In the weeks following the death of appellant's mother he was very nervous, according to Tijerina. He slept with a gun under his pillow. Once when Tijerina came home from work unexpectedly, appellant was hiding behind the door with the pistol drawn. He stated that he thought Tijerina was someone else, and indicated that his problems were money related.

Not long after the deceased's death appellant had a falling-out with Waldhauser. Appellant told Tijerina that the estrangement concerned a dispute over money.

William Askey was the bank officer responsible for administering the trust appellant received as part of his inheritance. He testified that in late 1975 or early 1976, appellant asked him for an advance of $3,000.00 from the trust. Since the trustee bank would advance a distribution only for a valid reason, Askey asked appellant why he needed the money. At first appellant was evasive, but he ultimately replied that he could be harmed if he did not come up with the money.

Dow Zabolio testified that appellant's arguments with the deceased over her refusal to fund his lavish life-style were a persistent feature of family life. In early 1975, Dow and appellant were returning from a trip to the airport where they had seen the deceased off on a European trip. On the way to the airport, appellant's mother had once again refused one of his requests for money. Appellant told Dow, "Now, I wouldn't put up with a woman like that." Dow testified that appellant made statements like that, "once in awhile."

Dow further testified that during a conversation among appellant, the deceased, and the appellant's sister, approximately one to two years before the deceased's death, appellant asked for his "inheritance money" from the estate of the deceased's first husband.[4]

Officer R.C. Horn investigated the scene of the deceased's death. Horn looked through the deceased's purse in an effort to find identification, but was never able to locate her driver's license.

Jerry Sol Eikenhorst, a onetime Harris County Jail inmate, was in a cell next to MacDonald's. Testimony established that he wrote to the appellant's lawyers detailing information MacDonald allegedly told him about the Zabolio case, information to the effect that: MacDonald had hired Janecka to kill the deceased for Waldhauser; MacDonald had never met appellant and appellant knew nothing about the plans to kill his mother; MacDonald and Waldhauser made up the story about the meeting at Alfred's Delicatessen in order to get a good deal from the district attorney's office.

When called as a defense witness, Eikenhorst testified, to the apparent surprise of defense counsel, that MacDonald never denied meeting or talking with appellant. Eikenhorst explained that he and appellant were both in isolation, but because their respective cases were in the same court, they planned and fabricated Eikenhorst's testimony while in the holdover cell awaiting court appearances. The two also met in the writ and rehabilitation rooms at the penitentiary in Huntsville. According to Eikenhorst, he agreed to take part in the fabrication because appellant offered to hire a lawyer for him once appellant was free and because Eikenhorst wanted the prestige within prison of having helped another inmate beat the system.

On cross-examination by the State, Eikenhorst mentioned a note given to him by appellant. The note contained a "script," according to Eikenhorst, that Eikenhorst was supposed to use, which detailed a defensive theory based on MacDonald's supposed revelations to Eikenhorst. This note was eventually admitted into evidence and read to the jury by Eikenhorst. Appellant stipulated that the handwriting on the note was his.

---

**4.** Appellant was the adopted child of the deceased and her first husband. His older sister was the natural child of the couple.

Part of the writing on the note was crossed out. The crossed-out portion posited that there had been a meeting at Alfred's Delicatessen but that it had been an innocuous business meeting as far as appellant was concerned, with Waldhauser introducing MacDonald as a stockbroker.

In the margins of the note, next to the crossed-out portion, appellant had written, "Imp. MacDonald Never Met Duff-Smith." The rest of the note essentially stated that Waldhauser and MacDonald had agreed to frame appellant in order to avoid the death penalty.

Eikenhorst also testified that Texas Department of Corrections' inmate Reginald Williams, who earlier testified for the defense that MacDonald admitted framing appellant, was part of appellant's scheme to fabricate a story about MacDonald.

Donald Wayne Chaline worked with appellant at Prudential Insurance Company in 1975. He had previously worked for various bail bondsmen. Chaline testified that though the two men were not close friends, they were on good terms with each other, because they were the only young men in their division. According to Chaline, appellant knew about Chaline's background in the bail bond business.

In the Spring of 1975, over the course of several days, appellant complained to Chaline about the difficulty he was having in financing the purchase of an automobile, and appellant repeatedly mentioned his mother's refusal to help with the financing.

During this same period, appellant arranged to meet Chaline for drinks one afternoon at a bar not far from the Prudential Building. A friend of appellant's was also present. Once more appellant bemoaned his mother's failure to facilitate the purchase of a car, but on this occasion he made a "harsh" statement Chaline had not heard before. Appellant stated that he "ought to have the bitch [his mother] killed. All the money's going to be mine anyway."

Chaline, who was shocked by the remark, did not directly respond and instead tried to change the subject. Though he did not think appellant was joking, Chaline took what was said with a grain of salt.

When Chaline read about the death of appellant's mother he was worried, but said nothing to anybody.[5]

Several months after the death, Chaline, while driving in southwest Houston, spotted appellant. Appellant motioned for Chaline to pull into a parking lot. It was obvious to Chaline from appellant's car and clothes that he was doing well.

Appellant talked about some prosperous deals he had been involved in and stated that he had received cash and stocks from his mother's estate. The discussion then shifted to the death itself:

"Q. Was the subject of suicide discussed?

"A. Yes.

"Q. And what relationship was the subject of suicide discussed? Who brought it up and what was said about it?

"A. Well, he kind of laughed or jokingly said about the police had ruled it a suicide which, you know, obviously it wasn't.

"Q. Why was it obviously that it wasn't? I mean, was that obvious to you?

"A. Because he told me it wasn't."

Appellant went into great detail with Chaline about how he had arranged the death of his mother. Appellant and a friend, a real estate investor and coin collector, had hired somebody to commit the offense. Appellant thought his stepfather would be home that night too, but he had been off somewhere. The killer waited several hours for the stepfather to come home. Appellant also told Chaline that, "his mother pretty well realized that she was going to die and accepted it."

5. The deceased's death was originally ruled a suicide. Two purported suicide notes were found in her bedroom and, in addition to the panty hose tied around her neck, a "practice" panty hose, tied into a loop, was found in a dresser drawer.

Chaline testified that appellant made fun of the police work on the case. Appellant mentioned some muddy footprints inside of the house that the police had completely overlooked and which were cleaned up before being discovered.

Once appellant made his admission to Chaline, Chaline recalled the conversation he had with appellant at the bar in the Spring of 1975. Chaline now believed that appellant's remarks at the bar had constituted an indirect request or testing of the waters to see if Chaline was willing to arrange the deceased's murder.

Chaline testified that he said nothing to the police about appellant's admission for over three years, because he felt implicated. Then in 1979 he read about the deaths by gunshot of appellant's sister Diana Wanstrath, brother-in-law John Wanstrath, and fourteen-month-old nephew Kevin Wanstrath. He started making anonymous phone calls and telling what he knew to Rick Nelson, a Houston Post reporter who was covering the Wanstrath killings. Nelson relayed the information to Johnny Bonds, the homicide detective investigating the Wanstrath killings, and Chaline ultimately met with Bonds.

Bonds testified that when he received the information supplied by Chaline, neither he nor any other officer with knowledge of the Zabolio case was aware of the existence of muddy footprints in the Zabolio house. Bonds verified the information, however, by talking to the caretaker Johnson. Bonds verified through Waldhauser himself that the latter was a coin collector and real estate investor.[6]

Art. 38.14, V.A.C.C.P., provides that:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

The test as to the sufficiency of corroborating evidence is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense. *Edwards v. State*, 427 S.W.2d 629, 632 (Tex.Cr.App. 1968).

In capital murder cases where reliance is placed on accomplice testimony, the accomplice witness must be corroborated as to the element which elevates murder to capital murder. *Fortenberry v. State*, 579 S.W.2d 482 (Tex.Cr.App.1979). Accord, see *County v. State*, 668 S.W.2d 708 (Tex.Cr.App.1984). As noted earlier, appellant does not contest the sufficiency of the corroborating evidence in general, but rather, contends that the corroborative evidence relevant to the element of remuneration was insufficient.

Appellant cites *Granger v. State*, 605 S.W.2d 602 (Tex.Cr.App.1980), and *McManus v. State*, 591 S.W.2d 505 (Tex.Cr.App. 1979), in support of the proposition that the non-accomplice evidence of murder for remuneration was insufficient.

*Granger* is not on point because in that case no evidence whatsoever was admitted in support of the remuneration element.

Appellant points to *McManus* as a case where far more was required, in the way of corroborative evidence on the remuneration element, than in the instant case. In the first place, *McManus* did not purport to establish any minimum evidentiary standard in cases such as this. Moreover, the non-accomplice testimony on the remuneration element, though sufficient, was not overwhelming.

*McManus* involved a defendant who murdered his employee's parents for one-third of the estate that she stood to inherit. The employee was the primary accomplice wit-

---

**6.** Not all of the information allegedly told to Chaline by appellant was consistent with the testimony ultimately given by MacDonald.

ness. The murder took place in late July of 1976 and had been planned for several months.

The defendant's girl friend in *McManus* testified that in June and July the defendant mentioned leaving town on vacation. The defendant told her this would not be until mid-August, because he was going to "run into some money."

An acquaintance of the defendant who was also a friend of the defendant's employee testified that the defendant would not allow the two friends to take a planned vacation in June. He told the acquaintance, "Well, if you all will just wait until late August [to go], I will pay for everything."

This Court held that the above evidence constituted sufficient corroboration of the accomplice testimony that the defendant had committed the murder for remuneration or the promise of remuneration.[7]

■ In the instant case, several non-accomplice witnesses gave testimony relevant to the remuneration element.

Perez, Tijerina, and Dow Zabolio testified to longstanding disputes between appellant and the deceased over the question of money, and to appellant's anger at the deceased's refusal to underwrite his lavish life-style.

Perez and Tijerina testified to the perilous state of appellant's finances just prior to his mother's death and Tijerina and Chaline testified concerning appellant's extreme haste to enjoy the fruits of his mother's estate by opening her safety deposit box the day after her death.

Finally, and most significantly, Chaline testified that appellant's threat or wish to kill his mother was directly connected to her failure to provide him with sufficient funds and his impatience at having to wait for his inheritance money. Appellant's later nonchalant admission of guilt to Chaline

was immediately preceded by a discussion of how prosperous appellant was doing as a result of inheriting a portion of his mother's estate. The death threat made in Chaline's presence *and* the later direct admission of guilt to Chaline, particularly when viewed together, tend to support the State's theory that appellant's primary motive in having his mother killed was his desire to immediately reap the proceeds of her estate.

We find that the non-accomplice testimony, considered in its entirety, "tends to connect the defendant with," a murder for remuneration. Appellant's third ground of error is overruled.

In his fourth ground of error, appellant complains that the admission into evidence of the "script" given to Eikenhorst by appellant violated the trial court's pretrial discovery and inspection order.

■ Appellant made no objection to the admission of the note in question.[8] It is well settled that the proper procedure when alleging surprise due to violation of a trial court's order for discovery is to object or ask for a postponement or continuance of the trial. *Lindley v. State,* 635 S.W.2d 541 (Tex.Cr.App.1982); *Quinones v. State,* 592 S.W.2d 933 (Tex.Cr.App.1980); *Hubbard v. State,* 496 S.W.2d 924 (Tex.Cr.App. 1973). Nothing is presented for review.

Appellant's fifth and sixth grounds of error relate to the indictment and jury instruction.

The indictment charges that appellant did unlawfully:

"and intentionally employ Walter Waldhauser to commit the murder of Gertrude Duff-Smith Zabolio for remuneration and promise of remuneration, namely, money, and the said Walter Waldhauser did on or about October 15, 1975, in Harris County, Texas, intentionally cause the death of Gertrude Duff-Smith Zabolio by strangling her with pantyhose, for

7. In *McManus* there was a dispute as to whether certain of the testimony on remuneration came from accomplice or non-accomplice witnesses. Nevertheless, we found that the testimony delineated above was sufficient by itself to corroborate on the issue of remuneration.

8. Until the following day, when he asked for a mistrial.

remuneration and promise of remuneration, namely money from Markum Duff-Smith.

"It is further presented that in Harris County, Texas, Markum Duff-Smith, hereafter styled the Defendant, heretofore on or about October 15, 1975, did then and there unlawfully, intentionally and knowingly cause the death of Gertrude Duff-Smith Zabolio by strangling her with pantyhose and said murder was committed for remuneration and the promise of remuneration, namely, the proceeds of the estate of Gertrude Duff-Smith Zabolio."

■ Though both paragraphs of the indictment charge capital murder under V.T.C.A. Penal Code, Sec. 19.03(a)(3), the theories behind the two paragraphs differ.

The first paragraph of the indictment charges appellant with "employing another to commit the murder for remuneration or the promise of remuneration," while the second paragraph alleges that appellant himself committed the murder for remuneration, namely, the proceeds of his mother's estate.

The State ultimately proceeded under the theory embodied in the second paragraph of the indictment. This is reflected in the application paragraph of the jury instruction applying the law to the facts which states:

"Now, therefore, if you find from the evidence beyond a reasonable doubt that on or about October 15, 1975, in Harris County, Texas, the defendant, MARKHAM DUFF-SMITH, did intentionally cause the death of GERTRUDE ZABOLIO by strangling her with a panty hose, for remuneration or the promise of remuneration, namely, proceeds from the estate of GERTRUDE ZABOLIO, in that the defendant, MARKHAM DUFF-SMITH, acting with specific intent to promote or assist the commission of this offense, and for remuneration, namely, proceeds from the estate of GERTRUDE ZABOLIO, solicited, encouraged or directed WALTER WALDHAUSER to commit this offense and WALTER WAL-

DHAUSER, acting with specific intent to promote or assist commission of this offense, solicited, encouraged or directed PAUL MACDONALD to commit this offense, and PAUL MACDONALD, acting with specific intent to promote or assist commission of the offense, solicited, directed, or encouraged, aided, or attempted to aid ALLEN WAYNE JANECKA to commit the offense, and that on or about October 15, 1975, in Harris County, Texas ALLEN WAYNE JANECKA intentionally caused GERTRUDE ZABOLIO's death by strangling her with a pantyhose, for remuneration or promise of remuneration, namely, money, then you will find the defendant, MARKHAM DUFF-SMITH guilty of capital murder, as alleged in the indictment."

In his fifth ground of error, appellant complains that the trial court erred in denying his motion to quash the indictment for insufficient notice. Notice was purportedly insufficient because, "The indictment, read as a whole did not give the appellant notice that the state intended to prove that the appellant committed capital murder by hiring Waldhauser to commit the offense and was criminally responsible for the acts of Waldhauser, who was responsible for the criminal acts of Paul MacDonald, who was responsible for the acts of Allen Wayne Janecka."

Appellant was convicted as a party to the offense. See V.T.C.A. Penal Code, Sec. 7.02(a)(2). The current Penal Code provides, in Sec. 7.01(c), that:

"All traditional distinctions between accomplices and principals are abolished by this section, and each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice."

In *Pitts v. State*, 569 S.W.2d 898, 900 (Tex.Cr.App.1978), we considered a question virtually identical to the one appellant now raises, and stated:

"In the new penal code, the legislature eliminated the distinction between principals and accomplices and the attendant complexities in drafting indictments.

Under the former code it was not necessary to allege the facts to show that a defendant was a principal; a principal offender could be charged directly with the commission of the offense although it was not actually committed by him; [citations omitted]; and V.T.C.A. Penal Code, Sec. 7.01(c) now plainly requires that we hold a party to an offense may be charged with the offense without alleging the facts which make the defendant a party to the offense and criminally responsible for the conduct of another. If the evidence supports a charge on the law of parties, as it does here, the court may charge on the law of parties even though there is no such allegation in the indictment."

*Pitts* has been repeatedly upheld by this Court. *Meanes v. State,* 668 S.W.2d 366, 372 (Tex.Cr.App.1983); *English v. State,* 592 S.W.2d 949 (Tex.Cr.App.1980). Appellant's fifth ground of error is overruled.

Appellant's sixth ground of error essentially rephrases his fifth. He avers that the jury charge is fundamentally defective because in naming appellant's accomplices it enlarges upon the indictment in violation of *Cumbie v. State,* 578 S.W.2d 732 (Tex. Cr.App.1979). The rule established in Pitts v. State, supra, applies whether objection is made to the jury charge, the indictment, or both. Appellant's sixth ground of error is overruled.

In his first and second grounds of error, appellant avers that two veniremen were improperly excused in violation of *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

■ With respect to venireman Harold C. Boyd, it is undisputed that appellant made no objection whatsoever to his being excused at the time of the voir dire. Appellant points, however, to a pretrial motion, allegedly denied by the trial court, which, he asserts, sufficed to preserve error.[9]

The Motion to Restrict The Prosecutor's Challenge Of Capital Veniremen Because Of The Influence Of The Mandatory Sentence Upon Fact Determinations reads, in pertinent part, as follows:

" . . .

"II.

"The defendant respectfully moves this court to restrict the prosecution's challenges for cause based on the provisions of Section 12.31(b), P.C., under which a juror can be disqualified when the mandatory sentence of death or life imprisonment would influence his deliberation as to any fact issue.

"III.

"The defendant further moves that this Honorable Court require the prosecution to go beyond merely asking the prospective jurors to swear under oath that their knowledge of the mandatory penalty of death or life imprisonment would not affect their judgment on any issue of fact, and that the court require the prosecution to establish as a predicate to a challenge for cause:

"That the juror unequivocally would be influenced in his factual determinations by his knowledge of the mandatory sentence, and

"That the juror, regardless of his personal feelings could not set aside such feelings and could not abide by the law and the court's instructions governing the range of punishment allowable for the crime of capital murder.

" . . . "

V.T.C.A. Penal Code, Sec. 12.31(b) provides that:

"Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall

---

9. Both the transcript and the statement of facts show that the motion was *granted* on April 8, 1981. Voir dire began on July 6, 1981. The voir dire of the two veniremen in question began on July 27, 1981.

be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

In *Adams v. Texas,* supra, the United States Supreme Court held that Sec. 12.-31(b), supra, can be used to exclude veniremen whose views on capital murder make them unable to follow the law or obey their oaths. But the statute cannot be used to exclude prospective jurors on broader grounds, based on their general opinions concerning the death penalty.

Assuming arguendo that appellant's pretrial motion matched his ground of error raised on appeal, appellant has failed to preserve error.

This Court has long held that the failure to object to the improper exclusion of veniremen waives that right and such exclusion cannot be considered on appeal. *Russell v. State,* 598 S.W.2d 238 (Tex.Cr.App. 1980); *Burks v. State,* 583 S.W.2d 389 (Tex.Cr.App.1979). We reiterated this rule in *White v. State,* 610 S.W.2d 504 (Tex.Cr. App.1981) even though the defendant had filed a pretrial motion challenging the statutory oath found in Sec. 12.31(b).

Appellant gave no indication during voir dire that he was displeased with the exclusion of venireman Boyd. Yet under his theory he can sit back and raise the issue of that exclusion on appeal, simply because of the existence of a pretrial motion ruled on two months earlier. Appellant proffers no rationale of trial strategy or tactics that would justify failure to object, during voir dire, to the exclusion of a capital venireman. He is obviously not in the position of a defendant who litigates a confession or search issue at a pretrial hearing but who does not want to raise such an objection in front of the jury at trial. See *Riojas v. State,* 530 S.W.2d 298 (Tex.Cr.App.1975); *Harryman v. State,* 522 S.W.2d 512 (Tex. Cr.App.1975). We find nothing in this situation that takes this case outside the boundaries of our *general* rule that the litigation of a pretrial motion does not automatically preserve error. See *Armitage v. State,* 637 S.W.2d 936 (Tex.Cr.App.1982); *Basham v. State,* 608 S.W.2d 677 (Tex.Cr. App.1980); *Hubbard v. State,* supra.[10]

Appellant failed to preserve for review the question of Boyd's exclusion.[11]

■ With respect to the exclusion of venirewoman Sarah Nagler, appellant asserts that he made a proper objection during voir dire.

Nagler was examined at length by the court and attorneys for each side. She was unable to say definitely that she could put aside her feelings against the death penalty and answer the punishment issues according to the court's instructions. Finally, the following occurred:

"THE COURT: No. We are coming to the source for our information.

"So the question of whether or not you could follow your oath in answering these questions or whether or not you would answer one of them contrary in resolving the conflict between your conscience and your oath so as to avoid the death penalty, even though you were convinced that the answer should be yes. That's where it comes down to.

"What would you do under that circumstance?

"MS. NAGLER: I'd come back to—I don't know.

"THE COURT: Do we have a challenge?

"MR. ARNOLD: Yes.

"THE COURT: Do you have any more questions?

"MR. BLAINE: What was her answer?

"THE COURT: She said she didn't know.

"MR. BLAINE: I don't think that's sufficient for challenge.

"THE COURT: I think it probably is under the circumstances.

---

**10.** For examples of exceptions to the general rule see *Cartwright v. State,* 527 S.W.2d 535 (Tex.Cr.App.1975); *Riojas v. State,* supra; *Harryman v. State,* supra.

**11.** Appellant's trial took place over a year after the decision in *Adams v. Texas,* supra, was rendered.

"MR. BLAINE: Let me go back again, Ms. Nagler. You impress upon me as being a woman of your convictions, and I don't doubt that. If you took an oath to do something, you'd do it just like if you had to take an oath to tell the truth, so help you God, as a witness, then you would tell the truth under your oath. Again, if you took an oath that a true verdict render, that you would do it.

"MS. NAGLER: I hope I would tell the truth.

"MR. BLAINE: Right. But again, of course, as I say, I know and I think again I know what you mean; you just don't want to be put in the position of doing it.

"MS. NAGLER: I would rather not be put in that position.

"MR. BLAINE: You realize if we had to select people down here that wanted to serve on this jury, then we probably would be in a bad way. People that come down who want to serve usually have some ulterior motive for wanting to serve. We would think people who don't want to serve are the people who ought to serve on juries, recognizing that it is a civic responsibility, and I don't know anybody who could determine these issues any better than you could.

"Again, are you telling me that if you took an oath, that you would a true verdict render according to the law and the evidence and that maybe you would violate that oath knowingly?

"MS. NAGLER: Yes, I would uphold the oath to the best of my—it's the other factor, it's the conscience.

"MR. BLAINE: The only—

"MS. NAGLER: What more can I tell you?

"MR. BLAINE: The only way I know that your conscience would affect you is maybe you would want a little more evidence than somebody who already believes in the death penalty and is anxious to give it. Now, that's what the Supreme Court says. It doesn't disqualify you just because it may affect your deliberations. It will not disqualify you. Only if it will affect them to such an extent that you would violate the oath you take.

"MS. NAGLER: Well, and this is what I have been saying all along what might happen, not knowingly—

"MR. BLAINE: Well, maybe you—

"MS. NAGLER: Emotional.

"MR. BLAINE: Basically in law, you have to knowingly and intentionally commit an act to be guilty of some law violation, so you would have to knowingly violate your oath. Would you knowingly and intentionally violate your oath just to—

"MS. NAGLER: Knowingly and intentionally—

"THE COURT: Now, you know you are going to have a conflict between your— you are going to have a conflict between your oath and your conscience. How are you going to resolve that conflict? Put your conscience aside and follow your oath or deliberately answer one of them wrong to resolve that conflict?

"MS. NAGLER: How does one know? In other words, isn't there a rationalizing that takes over so that while we can justify something to ourselves, oh, I did this under oath, but, on the other hand, I am sort of slanted where emotions or feelings take it over. In order to avoid something that way, no.

"THE COURT: That's why we devised this. It's the most objective way of arriving at an answer that can be absolutely unemotional.

"MS. NAGLER: Yes, sir. I think we are going—all right. I think we have reached the point where we are dealing a little bit in semantics. I am sort of—I don't know, I have got to leave it up to you. I have got mixed feelings about it.

"THE COURT: Are you saying you don't know how you would react or how you would resolve that conflict?

"MS. NAGLER: Exactly.

"THE COURT: Well, I take it that when I asked you a question, if you could put your conscience aside for a moment and just follow the law as I give it, and if you

**38**

don't know that you could do that, then I am going to excuse you.

"MS. NAGLER: I am saying who knows what takes over?

"THE COURT: You do for you.

"MS. NAGLER: Okay.

"THE COURT: Fine. And you don't know?

"MS. NAGLER: No. I have very mixed feelings.

"THE COURT: On how you would resolve it?

"MS. NAGLER: That's right.

"THE COURT: You are excused. You may be excused.

"MS. NAGLER: As much as I would like to do my duty ...

"(Whereupon, Ms. Nagler was excused.)"

Appellant maintains that his counsel's remark, "I don't think that's sufficient for challenge," constituted a proper objection. Counsel's statement made at an earlier time in the examination did not even rise to the level of a general objection. It was followed by numerous questions by counsel for appellant and the court. No objection was voiced when Nagler was excused by the court. Appellant's first and second grounds of error are overruled.

The judgment is affirmed.

CLINTON, J., concurs in the result.

TEAGUE, J., dissents to disposition of Ground of Error No. 5.