**Rhonda Bryan SCOTT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–87–261–CR.**

Court of Appeals of Texas, Corpus Christi.

May 12, 1988.

Rehearing Denied June 9, 1988.

Dick DeGuerin, DeGuerin & Dickson, Houston, for appellant.

Daniel W. Shindler, Dist. Atty., Bay City, for appellee.

Before UTTER, KENNEDY and BENAVIDES, JJ.

## OPINION

UTTER, Justice.

A jury found appellant guilty of murdering her husband Leslie Wayne Scott and assessed punishment at 75 years in the Texas Department of Corrections. The

judgment of the trial court is reformed, and as reformed, affirmed.

Before addressing the points of error raised in appellant's brief, we will consider her motion to abate the appeal for an out-of-time hearing on her motion for new trial. Appellant's present counsel contends in the motion that appellant's trial counsel filed a motion for new trial and then abandoned appellant, thereby allowing the motion for new trial to be overruled by operation of law without presentation to the trial court.

The trial court imposed sentence on March 12, 1987. Trial counsel filed appellant's motion for new trial on March 18.

Tex.R.App.P. 31 requires an accused to present his motion for new trial to the court within ten days of its filing, unless the trial judge permits it to be presented and heard within 75 days after the date sentence is imposed or suspended in open court.

As noted in *McIntire v. State*, 698 S.W. 2d 652 (Tex.Crim.App.1985), a defendant has a right to file and have heard a motion for new trial, provided the right is asserted within the time specified by law. *McIntire*, 698 S.W.2d at 660. Appellant did not timely assert her right. The issue ultimately raised by appellant's request to abate is whether appellant's right to be heard was lost because of counsel's ineffectiveness. We decline appellant's request to determine this matter through abatement for the reasons stated below.

The appellate record was due to be filed by June 22. On that date, the appellate record was filed without a statement of facts. On June 25 present appellate counsel notified this Court that he had entered the case on appellant's behalf.

A month later, on July 20, counsel filed a motion to extend the time for filing the statement of facts. This Court granted the motion and the statement of facts was filed on August 20, two months after the original due date. Counsel then filed a motion to extend the time for filing the appellant's brief. This Court granted the motion and the brief was filed on November 20, three months after the statement of facts had

been filed. The State filed its brief on December 14.

On December 22, six months after he entered the case, and after both the appellant's and State's briefs had been filed, counsel then requested the abatement and late hearing on appellant's motion for new trial. Ample time passed during which a hearing could have been held without delaying the appellate process.

■ We are aware of several recent decisions which have abated appeals to determine counsel's effectiveness in post-trial proceedings. *See Crawford v. State*, 741 S.W.2d 452 (Tex.Crim.App.1987); *Ward v. State*, 740 S.W.2d 794 (Tex.Crim.App.1987). Where, however, new counsel allowed, without explanation, six months to elapse between his entry into the case and his request for abatement, where no points of error were brought forward alleging that counsel's ineffectiveness prevented a hearing on the motion, and where the request did not come until both parties had filed their appellate briefs, we decline to abate the appeal. Appellant's motion to abate is overruled.

■ Appellant, in her first four points of error, contends that the first paragraph of the indictment is fundamentally defective. The first paragraph of the indictment alleges, or attempts to allege, capital murder. The second paragraph alleges murder. The third paragraph alleges criminal solicitation.

The State argues that it abandoned the capital murder allegations and proceeded on the second paragraph which alleged murder. The record reflects that prior to the jury voir dire and prior to the indictment being read to the jury it was agreed between the prosecutor for the State and appellant's trial attorney that the State would abandon the capital murder charge and the case would be tried on the murder and conspiracy charges. In reply to the State's brief, appellant suggests that the State deleted the allegations of remuneration from the first paragraph but did not abandon the first paragraph. By whatever terminology the parties wish to employ, it is apparent that the second paragraph of

the indictment alleges murder, that the case was prosecuted as a murder case, and that the jury was authorized to find appellant guilty under a theory consistent with the allegations in the second paragraph.

Accordingly, any defect in the first paragraph is irrelevant to appellant's conviction. See *Martinez v. State*, 742 S.W.2d 687 (Tex.Crim.App.1987); *Pannell v. State*, 666 S.W.2d 96 (Tex.Crim.App.1984); *Luera v. State*, 658 S.W.2d 566 (Tex.Crim.App. 1981). The first four points of error are overruled.

■ In his fifth point of error, appellant contends that the first paragraph of the indictment is fundamentally defective because it is fatally repugnant. Appellant, citing *Johnson v. State*, 149 Tex.Crim.R. 245, 193 S.W.2d 528 (App.1946) and *Odle v. State*, 139 Tex.Crim.R. 288, 139 S.W.2d 595 (App.1940), contends that the first paragraph of the indictment contains inconsistent allegations. To the extent they conflict with more recent notions of fundamental error, *Johnson* and *Odle* were overruled in *Green v. State*, 578 S.W.2d 411 (Tex.Crim. App.1979). If "repugnancy" can render one paragraph or count in an indictment ineffective, a multi-count indictment would not be void under modern notions of fundamental error because the indictment still alleges a valid offense. We overrule this point for the same reasons as points one through four: the second paragraph alleges an offense which supports the conviction. Appellant's fifth point is overruled.

■ We next address appellant's eighth point of error which challenges the sufficiency of the evidence, since this will put appellant's remaining points of error in perspective. Specifically, appellant contends that the State failed to adequately corroborate the testimony of Ricci Pozzi, an accomplice witness. The State introduced the following non-accomplice evidence to show appellant's guilt.

Shortly after 4:00 a.m. on March 6, 1986, a Matagorda County deputy sheriff discovered the body of appellant's husband, Leslie Wayne Scott near the rear of the Van Vleck Junior High School. Scott's pickup truck, containing its keys, was parked in a normal manner nearby. The truck was cold when discovered, indicating that it had been there for some time.

White markings on Scott's tanned body led police to believe that a ring and watch had been removed from the body.

Shortly after 7:00 a.m. investigator Mike Brown telephoned appellant at home in Victoria to inform her that Scott had been involved in an accident. He requested that she come immediately to the Sheriff's office in Bay City. Although Brown did not disclose the nature of the accident over the telephone, appellant asked Brown if she needed to bring an attorney with her.

Appellant arrived at the Sheriff's office at 11:00 a.m. She reported that she had last talked to Scott by telephone the previous evening at 5:00 and 9:30 p.m. Appellant lived in Victoria. Scott worked for the Missouri Pacific Railroad at the railyard in Angleton. Appellant told investigator Brown that she had never been to the Van Vleck Junior High.

Appellant further told the sheriff's investigator that Scott was supposed to have dropped off some photos at the school on March 3, but she did not know why he would have been at the school on the night of March 5.

A teacher at Van Vleck Junior High testified that appellant had photographed students at the school in December 1985.

An employee of the funeral home which prepared Scott's body testified that appellant wanted her husband's death certificate to be filed the day of his services, and that he had given appellant directions to the justice of the peace so that she could file the death certificate. Normally, the death certificate is processed by the funeral home and not given directly to family members.

Allen Snow testified that on January 26, 1986, appellant told him that her husband was "fooling around" with a couple of girls in Bloomington and that he had spent her daughter's savings. Appellant told Snow that she needed to have this problem taken care of so that she could get out of debt. She offered Snow $10,000 then and an addi-

tional $40,000 when the insurance was paid to kill her husband.

Snow also testified that appellant said she had talked to a person in Corpus Christi (about doing the job) and needed to have an answer from Snow soon.

A claims manager with Scott's company testified that because of a work related injury, Scott had been paid $83,500 in cash in June 1985. He also testified that $18,000 in life insurance on Scott was paid to appellant on April 1, 1986.

The medical examiner testified that Scott had been shot to death. One gunshot wound was located on the right side of Scott's face. Another was located on the left side of his chest. A .22 caliber bullet was removed from Scott's chest. Fragments consistent with a .22 caliber bullet were removed from the face wound.

The parties stipulated that a .22 caliber rifle found a short distance from Van Vleck Junior High was the murder weapon.

An insurance salesman in Victoria testified that in the middle of January 1986, appellant applied for a life insurance policy on her husband.

Shane Neeley testified that around March 1, 1986, he was working with Charles Brannan, who told Neeley that Scott's wife wanted something done to Scott because she was tired of being beaten. Brannan told Neeley that he would get $10,000 for the job when the insurance came in. Although Neeley refused to participate, he remained friends with Brannan.

Neeley and Brannan looked around the depot for a couple of hours to see whether the job could be done there. Ultimately, Brannan determined that there was too much traffic around the depot. At one point, someone Neeley thought was Scott passed in a pickup truck, and Brannan said, "There goes that son of a bitch."

The next day, Brannan and Neeley went back to the depot. Then, on their way back to Victoria, they stopped and met with another person, later identified as Ricci Pozzi. Brannan told Pozzi that it was too busy around the depot and that they would have to find a better place. Pozzi said the appel-

lant wanted something done quickly. Brannan and Pozzi then discussed how payment would be made.

The State also presented evidence showing telephone calls made to and from appellant's house on the night of the killing. This circumstantial evidence can be put into perspective only after the accomplice's testimony is set forth.

Ricci Pozzi testified that he and Charles Brannan killed Leslie Wayne Scott (around 10:00 p.m.) on March 5, 1986, at Van Vleck Junior High School. Brannan was the actual trigger man. Pozzi further testified to events which led up to and followed the actual killings.

In the latter part of 1985, appellant talked to Pozzi about having her husband killed. Pozzi and appellant had been having a sexual affair. Although Pozzi did not think that appellant was serious about killing Scott he approached several persons to see if they would do it.

Appellant encouraged Pozzi to talk to Charles Brannan about doing the job. Pozzi had known Brannan all his life. Appellant told Pozzi to offer Brannan $5,000 to kill Scott. Pozzi talked to Brannan in the early part of February. At first Brannan would not do it. Appellant then told Pozzi to offer him $10,000. A day or two later, Brannan accepted the offer. Brannan was to be paid $4,000 before the killing and the remaining amount was to be paid from life insurance proceeds. In the middle of February 1986, appellant gave $3,000 and Pozzi came up with $1,000 for the initial payment.

A few days before the killing, Pozzi met Brannan at a roadside park. Brannan, who had someone with him, told Pozzi that the killing could not be done at the railroad yard in Angleton because there was too much activity there.

In the late morning of the day that the killing actually occurred, Pozzi, appellant, and Brannan met at Pozzi's house. Appellant said that she knew of two schools in Van Vleck and that she could "coach" Scott to one of the schools. Appellant and Brannan left the meeting together. Appellant

said she would show Brannan the schools and that she would call Pozzi when they returned.

Around 7:00 p.m. on March 5, Pozzi and Brannan went to Van Vleck in Pozzi's pick-up. When they got to Bay City, Pozzi called appellant. Appellant said she would call Scott. Pozzi and Brannan then went to the Junior High.

They then went back to Bay City and called appellant. She was to call Scott and tell him to go to the school because the principal had left some pictures near some double doors by the back of the school.

Pozzi and Brannan then went back to Van Vleck. They called appellant again to see if she had gotten the message to Scott. They then went back to the school and waited. This was a little after 9:00.

About an hour later, Scott arrived. Brannan shot and killed Scott. Pozzi then took Scott's watch, ring and wallet. Appellant had suggested they make it look like a robbery. After that, Brannan and Pozzi left the school. Brannan threw the murder weapon out the window as they left Van Vleck.

As they headed back for Victoria, they stopped in El Campo and telephoned appellant to let her know that Scott had been shot.

Pozzi testified that he cut up Scott's ring band but took the diamonds out of it because appellant wanted to make a necklace. He discarded the watch and wallet.

In July 1986, Pozzi was arrested in connection with the killing of Scott. At that time, he continued his affair with appellant. Appellant sent letters to him using a fake name. He and appellant also made arrangements to meet at a motel in New Braunfels.

Pozzi testified that he made five telephone calls to appellant on the evening of March 5. The first was around 8:30. This was to let appellant know that he and Brannan were running late. After this call, they went and checked out the school.

The second call was made 30 to 40 minutes after the first. This call was to let

appellant know that everything was all right and that appellant could call Scott.

The third call was made from Van Vleck about 10 minutes after the second call. Appellant told Pozzi that she had talked to Scott and that he was on his way.

The fourth call was made from El Campo following the killing. Pozzi told appellant they were all right and would be home in a little while.

The fifth call, a local call, was made from Victoria around midnight or 1:00 a.m.

Other non-accomplice testimony was introduced by the State. Keith Kilgore, an investigator with the Sheriff's department, testified that he retraced Pozzi's steps with Pozzi. Pozzi pointed out where the body was, and the location of the murder weapon.

He also pointed out a phone at a convenience store he had used to call appellant. Telephone records showed that a call had been made from the location at 8:58 p.m. to appellant's telephone in Victoria (512–576–9321). At 9:05 p.m., a call was placed from another phone in appellant's residence (512–575–1710) to the Lake Jackson Holiday Inn, where Scott was staying. Appellant testified that 575–1710 was the number of the phone in the bedroom.

Kay Schulte testified that she went to appellant's house between 9:30 and 10:00 on the evening of the killing. Sometime around 11:30, the phone rang. Appellant just shook her head and said "uh-huh." According to Schulte, she heard the caller say, "We are okay and I will be home in thirty minutes."

Appellant testified in her own defense. She denied involvement in the killing. Appellant admitted that she and Scott had withdrawn $5,000 from a bank account in mid-February. She said that she and Scott had lent the money to Pozzi for what he said were attorney's fees incurred in the course of his divorce. Appellant admitted that she had met with Richard Snow but denied ever offering him money to kill Scott.

Appellant said she continued her affair with Pozzi after his arrest because she did

not think he had anything to do with Scott's killing. She admitted meeting Pozzi at out-of-town motels following his arrest.

Tracy Scott testified that on the morning after her father was shot, appellant said she had to go to Van Vleck.

The standard for determining whether the evidence sufficiently corroborates accomplice testimony is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence; that is, evidence of incriminating character which tends to connect the defendant with the commission of the offense. *Reed v. State,* 744 S.W.2d 112 (Tex.Crim.App.1988).

All the facts and circumstances in evidence may be viewed to furnish the necessary corroboration, and the corroborative evidence may be circumstantial or direct; the corroboration need not directly link the accused to the crime or be sufficient in itself to establish guilt. *Granger v. State,* 683 S.W.2d 387 (Tex.Crim.App.1984); *Valdez v. State,* 700 S.W.2d 338 (Tex.App.— Corpus Christi 1985, pet. ref'd).

Apparently insignificant circumstances sometimes afford the most satisfactory evidence of guilt and corroboration of the accomplice witnesses' testimony. *Paulus v. State,* 633 S.W.2d 827 (Tex.Crim.App. 1982).

In the present case, there is evidence that appellant tried to hire Richard Snow to kill her husband about six weeks before her husband's death. This event occurred contemporaneously with her attempt to secure additional life insurance on her husband.

Other circumstances are present which could lead a rational trier of fact to find the accomplice testimony sufficiently corroborated:

a) Appellant, when notified of her husband's "accident," asked whether she should bring a lawyer.

b) Appellant, when telling her daughter where she was going on the morning of March 6, said she needed to go to Van Vleck, the place where Scott was killed, even though the officer told her only that she had to come to Bay City.

c) No relationship between Van Vleck Junior High School and Scott was established except for the connection appellant had with the school through her photography job. Appellant tried to conceal her relationship to the school when interviewed on the morning that Scott's body was discovered.

d) Kay Schulte's recollection of what the telephone caller said on the night of March 5 verifies Ricci Pozzi's testimony on that matter.

e) Appellant transferred $3,000 to Pozzi in February 1986.

f) Telephone records indicate a call was made to Scott from appellant's phone at the time Pozzi testified it would have been made. Scott apparently went to Van Vleck following his conversation with the appellant.

g) Appellant continued her affair with Pozzi after he had been implicated in her husband's death.

While some of these points are more damaging than others, the combined cumulative weight of the evidence tends to connect appellant to the commission of the offense. *See Edwards v. State,* 427 S.W.2d 629 (Tex.Crim.App.1986). Unlike *Castaneda v. State,* 682 S.W.2d 535 (Tex. Crim.App.1985), relied on by appellant, the corroborated facts do more than merely show that the offense was committed. Appellant's eighth point of error is overruled.

In points of error six and seven, appellant contends that the charge is fundamentally defective because it did not require the jury to find that appellant personally committed the offense or that she was criminally responsible for the commission of the offense by Charles Brannan. As appellant did not object at trial on this ground, any error to cause reversal must meet the egregious harm standard set forth in *Almanza v. State,* 686 S.W.2d 157 (Tex.Crim.App.1985).

Appellant relies on *Zuckerman v. State,* 591 S.W.2d 497 (Tex.Crim.App.1979), in support of his position. In *Zuckerman,*

the Court of Criminal Appeals reversed the conviction because the trial court's charge allowed the jury to convict the defendant without a finding that the defendant was criminally responsible for the acts of his co-defendant.

The issue in the present case is more complex than that presented in *Zuckerman.* Here, appellant's guilt, under the State's theory of the case as presented in the charge, was based on appellant's conduct in aiding Ricci Pozzi, who in turn aided Charles Brannan in committing the offense.

The relevant portion of the charge in the present case instructs the jury as follows:

Now if you find from the evidence beyond a reasonable doubt that on or about the 5th day of March, 1986, in Matagorda County, Texas, the defendant, Rhonda Bryan Scott, did then and there intentionally and knowingly cause the death of an individual, Leslie Wayne Scott, by shooting him with a gun, in that Rhonda Bryan Scott, acting with specific intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided or attempted to aid, Ricci Shay Pozzi to commit the offense and Ricci Shay Pozzi, acting with specific intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid Charles Eameal Brannan to commit the offense, and on or about the 5th day of March, 1986, in Matagorda County, Texas, Charles Eameal Brannan, intentionally and knowingly caused the death of Leslie Wayne Scott by shooting him with a gun, then you will find the defendant, Rhonda Bryan Scott, guilty of murder as charged in the indictment.

The trial court further instructed the jury abstractly on the law of parties in accordance with Tex.Penal Code Ann. §§ 7.02 to 7.03 (Vernon 1974).

Appellant's complaint, in essence, is that one cannot be convicted of an offense merely by being a party to a party. Texas law, appellant argues, does not allow a conviction in this manner, and therefore, the charge, which authorizes a conviction in this manner, is fundamentally defective.

Chapter 7 of the Texas Penal Code addresses a person's criminal responsibility for the conduct of another. Tex.Penal Code Ann. § 7.01(a) provides that:

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

The State argues that because Ricci Pozzi was criminally responsible for Charles Brannan's conduct, and because appellant acted with the requisite intent and aided Pozzi, appellant was criminally responsible for Pozzi's criminal conduct.

This same sort of chain of responsibility in the court's charge was used to convict the accused in *Duff–Smith v. State,* 685 S.W.2d 26 (Tex.Crim.App.1985). While the same point of error presented here was not presented in *Duff–Smith,* it would appear that if the submission of that case under the Court's charge alleging the chain of responsibility was fundamental error, the Court of Criminal Appeals would have reversed the case. *Almanza v. State,* 686 S.W.2d 157 (Tex.Crim.App.1984).

A person should not be able to escape criminal liability for the completed crime by insulating himself from the actual perpetrator of the offense.

When the accused, acting with intent to promote or assist the commission of the offense, solicits, encourages, directs, aids, or attempts to aid another who acts with intent to promote or assist a third person in the commission of the offense, and he solicits, encourages, directs, aids, or attempts to aid the third person to actually commit the offense, the accused must share the criminal responsibility for the crime committed.

Tex.Penal Code Ann. § 7.02(a) (Vernon 1974) provides several ways in which a person can be criminally responsible for an offense committed by the conduct of another, and Tex.Penal Code Ann. § 7.01(b) provides that each party to an offense may be charged with commission of the offense.

Through his conduct and intent, Pozzi was criminally responsible and liable to be charged with committing the offense. Through her conduct and intent, appellant was likewise criminally responsible for Pozzi's conduct, and therefore liable to be charged with committing the offense.

We find that the charge did not mistate the law. Therefore the charge cannot be fundamentally defective. Appellant's sixth and seventh points of error are overruled.

In his ninth point of error appellant contends that she was denied her right to due process because her own counsel told the jurors they were free to consider bias and prejudice during the punishment phase of trial. There was, of course, no objection at trial on this point. It appears that counsel was arguing for leniency from the jury. Arguing for probation and presenting his client as already having suffered, appellant's counsel was apparently trying to sway the jurors in appellant's favor. This type of argument could not have deprived appellant of her right to due process. Appellant's ninth point of error is overruled.

In her tenth point, appellant argues that the trial court erred by including an affirmative finding on appellant's use and exhibition of a deadly weapon during the offense. The State confesses that the trial court erred, as appellant was charged and convicted as a party to the offense. *See Travelstead v. State*, 693 S.W.2d 400 (Tex.Crim. App.1985). The trial court should not have included an affirmative finding in the judgment. Accordingly, appellant's tenth point of error is sustained.

The judgment of the trial court is REFORMED to delete the affirmative finding on use and exhibition of a deadly weapon. As reformed, the judgment of the trial court is AFFIRMED.