ACCEPTED
12-14-00185-CR
TWELFTH COURT OF APPEALS
TYLER, TEXAS
2/18/2015 10:55:31 AM
CATHY LUSK
CLERK

**NO. 12-14-00185-CR**

**IN THE COURT OF APPEALS
FOR THE TWELFTH DISTRICT OF TEXAS
AT TYLER**

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
2/18/2015 10:55:31 AM
CATHY S. LUSK
Clerk

**JONATHAN BAKER,**
APPELLANT

v.

**THE STATE OF TEXAS,**
APPELLEE

*On appeal from the 283rd Judicial District Court of Dallas County
In Cause Number F13-00422-T*

**STATE'S BRIEF**

*Counsel of Record:*

Susan Hawk
*Criminal District Attorney*
Dallas County, Texas

Johanna H. Kubalak
*Assistant District Attorney*
State Bar No. 24014297
Frank Crowley Courts Bldg.
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3639
(214) 653-3643 *fax*
Anna.Kubalak@dallascounty.org

***ATTORNEYS FOR THE STATE OF TEXAS***

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ...................................................................................iv

STATEMENT OF THE CASE ................................................................................1

STATEMENT OF FACTS .....................................................................................1

    A.   Joniah Baker is born on December 29, 2010, to appellant and his fiancée, Tamika Sanford.........................................................1

    B.   At about seven months of age, Joniah begins exhibiting troubling symptoms....................................................................2

    C.   On December 7, 2011, after a day spent alone with appellant, Joniah is brought to the emergency room in cardiac arrest and with multiple injuries. ...........................................................3

    D.   Detectives interview appellant in an attempt to obtain an explanation for Joniah's injuries. ...............................................5

    E.   A physician who specializes in child-abuse cases determines that Joniah's injuries are consistent with physical abuse.................9

    F.   Joniah dies two days after he is brought to the hospital. ...............11

    G.   An autopsy reveals the full extent of Joniah's injuries. .................11

    H.   An expert witness testifies for the defense that Joniah's death was caused by complications from a prior injury..........................14

    I.   Appellant's sister-in-law testifies in support of the defense theory that Joniah's injuries occurred prior to December 7, 2011. ...................................................................................17

    J.   A second medical examiner who was present during Joniah's autopsy disagrees with the opinions of the defense expert.............18

SUMMARY OF ARGUMENT.................................................................................20

ARGUMENT ........................................................................................................22

RESPONSE TO ISSUE ONE:

The evidence is legally sufficient to prove that appellant intentionally or knowingly caused the victim's death. ......................... 22

A.  A legal-sufficiency review assesses the rationality of the jury's verdict. ................................................................................ 22

B.  Capital murder requires proof of causation and an intentional or knowing act. ..................................................................... 23

C.  The evidence is legally sufficient to prove that appellant caused Joniah's death. ............................................................. 24

    1.  Joniah sustained his injuries after he was left alone with appellant. ........................................................................ 25

    2.  Appellant's various accounts of the events of that day did not explain the severity of Joniah's injuries. .......................... 28

    3.  The jury was entitled to reject the defense's theories about the cause of Joniah's death and the nature of his skin injuries. .................................................................... 31

D.  The evidence is legally sufficient to prove that appellant acted intentionally or knowingly. ...................................... 36

RESPONSE TO ISSUES TWO AND THREE:

Appellant failed to preserve his complaint that the trial court erred in allowing testimony from a witness whose name did not appear on the State's witness list at least 30 days prior to trial. ....................................................................................... 40

A.  Appellant did not raise his constitutional claims at trial, and he failed to request a continuance to preserve his claim that he was not prepared for the witness's testimony. ............................. 40

B.  Even if appellant preserved his complaint, the trial court did not err in allowing the witness to testify .................................... 46

PRAYER ........................................................................................ 48

CERTIFICATE OF COMPLIANCE ......................................................... 49

CERTIFICATE OF SERVICE ............................................................... 49

iii

# INDEX OF AUTHORITIES

*Cases*

*Barnes v. State,*
876 S.W.2d 316 (Tex. Crim. App. 1994)...................................................45

*Cuadros–Fernandez v. State,*
316 S.W.3d 645 (Tex. App.—Dallas 2009, no pet.)...................................25

*Duff-Smith v. State,*
685 S.W.2d 26 (Tex. Crim. App. 1985) ...................................................45

*Fuller v. State,*
253 S.W.3d 220 (Tex. Crim. App. 2008)...................................................44

*Garcia v. State,*
16 S.W.3d 401 (Tex. App.—El Paso 2000, pet. ref'd) ..............................25

*Geesa v. State,*
820 S.W.3d 154 (Tex. Crim. App. 1991)...................................................31

*Guevara v. State,*
152 S.W.3d 45 (Tex. Crim. App. 2004) ...................................................31

*Hamann v. State,*
428 S.W.3d 221 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) . 46, 47, 48

*Hernandez v. State,*
819 S.W.2d 806 (Tex. Crim. App. 1991)...................................................36

*Hooper v. State,*
214 S.W.3d 9 (Tex. Crim. App. 2007) ................................................22, 23

*Isassi v. State,*
330 S.W.3d 633 (Tex. Crim. App. 2010)...................................... 22, 36, 37

*Jackson v. Virginia,*
443 U.S. 307 (1979)..............................................................................22, 23

*Kemmerer v. State,*
113 S.W.3d 513 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) ............28

*Laster v. State*,
275 S.W.3d 512 (Tex. Crim. App. 2009)................................................23, 31

*Lindley v. State*,
635 S.W.2d 541 (Tex. Crim. App. 1982)................................................... 45

*Louis v. State*,
393 S.W.3d 246 (Tex. Crim. App. 2012)....................................... 24, 37, 38

*Martin v. State*,
246 S.W.3d 246 (Tex. App.—Houston [14th Dist.] 2007, no pet.)........34, 36

*Martinez v. State*,
867 S.W.2d 30 (Tex. Crim. App. 1993) ................................................... 46

*Merritt v. State*,
368 S.W.3d 516 (Tex. Crim. App. 2012)................................................. 32

*Montgomery v. State*,
198 S.W.3d 67 (Tex. App.—Fort Worth 2006, pet. ref'd) ...................30, 39

*Nobles v. State*,
843 S.W.2d 503 (Tex. Crim. App. 1992).................................................. 47

*Oprean v. State*,
201 S.W.3d 724 (Tex. Crim. App. 2006)................................................. 45

*Patrick v. State*,
906 S.W.2d 481 (Tex. Crim. App.1995).................................................. 36

*Paulson v. State*,
28 S.W.3d 570 (Tex. Crim. App. 2000) .................................................. 31

*Sanders v. State*,
No. 05-12-01186-CR, 2014 Tex. App. LEXIS 4430 (Tex. App.—Dallas Apr.
23, 2014, pet. ref'd) (not designated for publication)................................ 46

*Tamez v. State*,
205 S.W.3d 32 (Tex. App.—Tyler 2006, no pet.) ...............................45, 48

*Wise v. State*,
364 S.W.3d 900 (Tex. Crim. App. 2012)............................................23, 31

*Wood v. State,*
    18 S.W.3d 642 (Tex. Crim. App. 2000) ................................................... 46

***Statutes***

Tex. Penal Code Ann. § 12.31 (West Supp. 2014) ......................................... 1

Tex. Penal Code Ann. § 19.02 (West 2011) ................................................ 23

Tex. Penal Code Ann. § 19.03 (West Supp. 2014) .................................... 1, 23

Tex. Penal Code Ann. § 6.03 (West 2011) .............................................24, 39

Tex. Penal Code Ann. § 6.04 (West 2011) ................................................ 24

***Rules***

Tex. R. App. P. 33.1 ......................................................................44, 45

**TO THE HONORABLE COURT OF APPEALS:**

The State of Texas submits this brief in response to the brief of appellant, Jonathan Baker.

## STATEMENT OF THE CASE

A jury convicted appellant of capital murder of a child under the age of ten. (C.R.: 8, 45, 48; R.R. 7: 69). *See* Tex. Penal Code Ann. § 19.03(a)(8) (West Supp. 2014). The State did not seek the death penalty, so the trial court imposed the mandatory sentence of life imprisonment without the possibility of parole. (C.R.: 48; R.R. 7: 69). *See id.* § 12.31(a)(2).

## STATEMENT OF FACTS

### A. Joniah Baker is born on December 29, 2010, to appellant and his fiancée, Tamika Sanford.

Tamika Sanford and appellant met in 2009 and began dating. (R.R. 3: 19). Several months into their relationship, Tamika became pregnant. (R.R. 3: 20). The couple moved in together and eventually became engaged. (R.R. 3: 18-20). Their son, Joniah Baker, was born on December 29, 2010. (R.R. 3: 21; R.R. 7: SX-17). At the time of Joniah's birth, both Tamika and appellant were unemployed. (R.R. 3: 21-22). When Joniah was about five months old, in May or June 2011, Tamika took a job as a barista at a Starbucks coffee shop. (R.R. 3: 22, 40, 61). She normally worked from five or seven o'clock in the

1

morning until two or four o'clock in the afternoon. (R.R. 3: 23). Appellant would stay home with Joniah while Tamika was at work. (R.R. 3: 23, 31-32). Initially, appellant's mother was living in the home, too. (R.R. 3: 21). She moved out a few months after Tamika began working. (R.R. 3: 23).

### B. At about seven months of age, Joniah begins exhibiting troubling symptoms.

On July 28, 2011, when Joniah was almost seven months old, Tamika and appellant took him to the emergency room because he had spit up a little bit of blood. (R.R. 3: 66, 78, 114-15). They took him to the emergency room again on September 19 for an upper-respiratory infection. (R.R. 3: 64-65; R.R. 5: 75). At that visit, they also reported that Joniah had been crying a lot and that his activity level and appetite had changed. (R.R. 3: 66; R.R. 5: 75). Eleven days later, Joniah was back in the emergency room with a fever and vomiting. (R.R. 3: 64-65; R.R. 5: 75-76).

During the last week of November, Joniah rolled off his parents' bed while he was in Tamika's care. (R.R. 3: 24, 63). He landed on his back on the floor, which was covered only by thin, unpadded carpeting. (R.R. 3: 24, 69). He cried for a few minutes and then seemed fine. (R.R. 3: 24-25). A few days later, appellant told Tamika that Joniah had fallen off the bed again while she was at work. (R.R. 3: 28-29). After this second reported fall, Joniah began acting differently. (R.R. 3: 29). He seemed weak and sick, and he was

2

throwing up frequently. (R.R. 3: 29-30). About a week later, on Monday, December 5, Tamika and appellant took Joniah to the pediatrician. (R.R. 3: 30, 70-71). The pediatrician was not concerned about the two falls from the bed but did suggest that the parents try to feed Joniah yogurt since he was refusing milk. (R.R. 3: 30-31).

### C. On December 7, 2011, after a day spent alone with appellant, Joniah is brought to the emergency room in cardiac arrest and with multiple injuries.

Wednesday, December 7, 2011, began as a normal work day for Tamika. (R.R. 3: 34, 39). She got up early to get ready for her 7 a.m. shift and then woke up appellant and Joniah so that appellant could drive her to work, since the couple only had one car. (R.R. 3: 34, 39-40). Appellant dropped her off at work, and Tamika said goodbye to Joniah. (R.R. 3: 40). At about 10 a.m., Tamika called home and spoke to appellant. (R.R. 3: 41). He told her that Joniah was sleeping. (R.R. 3: 41). Tamika finished her shift at 4 p.m. and waited for appellant and Joniah to pick her up. (R.R. 3: 42-43). While she was waiting, appellant called and told her that Joniah's breathing was "faint" and that they needed to go to the hospital. (R.R. 3: 43). About five minutes later, appellant drove up. (R.R. 3: 44). Tamika jumped in the front seat, and they headed to Children's Medical Center. (R.R. 3: 44, 154, 159). Joniah was in his car seat directly behind Tamika, so she could not see him. (R.R. 3: 45).

3

As they drove, she asked appellant to put a hand on the baby's chest to check his breathing. (R.R. 3: 45). Appellant did, and he told Tamika that it was still faint. (R.R. 3: 45).

They arrived at the hospital at about 4:30 p.m. and pulled into the parking garage. (R.R. 3: 45, 158). Tamika got out of the car, but appellant would not let her get Joniah. (R.R. 3: 45-46). Instead, he told her to just get her things. (R.R. 3: 46). Appellant grabbed Joniah from the backseat and began running with him toward the entrance to the hospital. (R.R. 3: 46-47). It was then that Tamika noticed that Joniah, who was wearing a hoodie and sweatpants, was not moving. (R.R. 3: 46-47). When they reached the doors of the hospital and appellant handed Joniah over to hospital staff, Tamika noticed that the baby's skin was a bluish-grayish color and his lips were pale. (R.R. 3: 47-48).

Dr. Jo-Ann Nesiama was the physician in charge of the emergency room at Children's that afternoon and one of the first physicians to see Joniah when he was brought in. (R.R. 3: 154, 158-59, 170). She quickly determined that the baby was not breathing and had no heartbeat. (R.R. 3: 160-61). He was also very cold. (R.R. 3: 163). This, along with the bluish-grayish color of his skin, suggested to Dr. Nesiama that Joniah had not been breathing for quite some time. (R.R. 3: 160, 163-64). Dr. Nesiama and other hospital staff

4

immediately began resuscitative efforts. (R.R. 3: 160-62). After about 40 minutes of active chest compressions, Joniah finally regained a pulse. (R.R. 3: 166-67). He was still not breathing on his own, however, so he was placed on a ventilator and moved to the intensive care unit. (R.R. 3: 174). After they had stabilized Joniah, doctors examined him further and discovered that he had numerous injuries, including a head injury, fractured ribs, and multiple linear skin injuries — which were initially thought to be scratches or abrasions — to different surfaces of his body. (R.R. 3: 51, 56; R.R. 4: 74, 78, 163-66; R.R. 5: 90-91; R.R. 6: 66-68). He also had what appeared to be bite marks on his heels. (R.R. 4: 87, 164).

Appellant told Dr. Nesiama that Joniah had woken up sick that morning and had taken two naps during the day. (R.R. 3: 171-72). When Joniah was still "not acting like himself" after he woke up from his second nap at about 3 p.m., appellant decided to bring him to the hospital. (R.R. 3: 172). Because appellant's account of the events of that day did not explain Joniah's many injuries, Dr. Nesiama contacted the hospital social worker who, in turn, contacted CPS and the police. (R.R. 3: 172; R.R. 4: 73-75).

### D. Detectives interview appellant in an attempt to obtain an explanation for Joniah's injuries.

Glen Slade, a detective in the Dallas Police Department's child-abuse division, was assigned to investigate this case. (R.R. 4: 68, 70, 72-73; R.R. 5:

28-29). Detective Slade, accompanied by another child-abuse detective, Johnny Van, went to the hospital on the evening of December 7, 2011, to speak with medical personnel and Joniah's parents. (R.R. 4: 73-75). Detective Slade interviewed Tamika, while Detective Van interviewed appellant. (R.R. 4: 75). After these initial interviews failed to yield any explanation for Joniah's injuries, Detective Slade requested permission to search the couple's home. (R.R. 4: 76-77; R.R. 5: 35). Appellant signed a consent-to-search form and accompanied the detectives to the house, where he walked them through his day with Joniah. (R.R. 4: 77-78, 117). Appellant told detectives that Joniah had gone limp in his arms while he was giving him a bath and that he may have scratched the baby with his fingernails. (R.R. 4: 78-80, 87). Detective Slade photographed the plastic baby tub where Joniah was bathed. (R.R. 4: 79; R.R. 7: SX-3). He also photographed the bed that Joniah had reportedly fallen off of twice a couple of weeks earlier. (R.R. 4: 80; R.R. 7: SX-4). Using a tape measure, he determined that the top of the bed was approximately two feet off the ground. (R.R. 4: 80-81; R.R. 7: SX-19).

After searching the house, Detectives Slade and Van asked appellant to accompany them back to the police station so they could talk to him further. (R.R. 4: 83-84). Appellant agreed. (R.R. 4: 84). At the station, appellant was placed in an interview room that was equipped with a video camera, and his

6

subsequent conversations with the detectives were videotaped. (R.R. 4: 85). Detective Slade interviewed appellant first, while Detective Van observed from another room. (R.R. 4: 85). At trial, Detective Slade recounted the explanations that appellant gave him for how Joniah might have been injured:

> He stated that he doesn't know why the baby went limp in his arms because he was just giving the baby a bath. He said the baby was crying a lot, the baby was frustrated, the baby was fighting him giving him a bath, wriggling around. And he slipped in his hands and that's how he scratched him.

> He said his hands went down his legs and he scratched his legs. He didn't explain any other scratches on the baby. No head injuries. At one time he said, "It's possible maybe when he slipped in my hands he might have hit his head on the tub." But the tub is plastic and it wouldn't have hurt him.

> I asked him — because we also saw bite marks on the child's heels. I asked him about those and he thought about it a minute and then he said, "Well, yeah. I remember after the tub incident I laid him on the bed and he was fighting me so I had to hold his feet with my teeth so I could put his pants on him."

(R.R. 4: 87). Appellant told Detective Slade that after dressing Joniah, he propped him up with some juice. (R.R. 4: 128). He said that Joniah drank some of the juice but was leaning over to the side. (R.R. 4: 128). When he went to pick him up to go get Tamika, he noticed that Joniah was "groaning a little bit." (R.R. 4: 128-29).

At some point during the interview, appellant seemed to be getting nervous and told the detectives that he wanted to go home. (R.R. 4: 89-90).

7

The detectives then made the decision to place appellant under arrest for suspicion of injury to a child. (R.R. 4: 90). Appellant begged the officers not to arrest him and asked for another chance to explain. (R.R. 4: 90). This time, Detective Van interviewed appellant while Detective Slade observed. (R.R. 4: 90). Detective Slade testified at trial that appellant admitted, during his conversation with Detective Van, that he had shaken Joniah:

> The father tried to explain to Van that the child was crying a lot and he was trying to calm him down and he did shake him but he knows you can't shake with your arms fully extended. Just do it in the body like this and you can't hurt them.
>
> And he did that a couple of times but it wasn't severe. And he tried to explain how the child fell out of his arms. On several occasions his hands would go around like this, trying to show how he scratches the baby's legs.

(R.R. 4: 91). Detective Van brought a doll into the interview room and had appellant demonstrate the type of mild shaking he was describing. (R.R. 4: 94). Appellant admitted to being frustrated with Joniah and to saying things like, "Why you tripping, fool?" and "Dude, you're pissing me off." (R.R. 4: 94-95, 103-04). But he never admitted to violently hitting or shaking the baby. (R.R. 4: 94, 104, 120).

Before taking appellant into custody, the detectives photographed his fingernails and collected scrapings from underneath them. (R.R. 4: 104-05; R.R. 5: 24-25; R.R. 7: DX-7, -8, -9, -10). Subsequent DNA analysis detected

8

low-level amounts of DNA in the scrapings. (R.R. 4: 136-37, 140). A partial DNA profile obtained from the left-hand fingernail scrapings matched Joniah's DNA profile. (R.R. 4: 140-41).

**E. A physician who specializes in child-abuse cases determines that Joniah's injuries are consistent with physical abuse.**

Dr. Matthew Cox is a board-certified child-abuse pediatrician and the medical director of the REACH program, which evaluates children when there are concerns about possible abuse or neglect. (R.R. 4: 156-58). Dr. Cox examined Joniah at Children's Medical Center on the afternoon of December 8, 2011, approximately 24 hours after the baby's admission to the hospital. (R.R. 4: 159-60, 220). In addition to performing his own head-to-toe assessment of Joniah, Dr. Cox also reviewed Joniah's medical records and imaging studies, spoke to the other doctors and nurses who had treated him, and obtained his medical history. (R.R. 4: 160-61). From Tamika, Dr. Cox learned of Joniah's two previous falls from the bed at home. (R.R. 4: 161-62).

Dr. Cox testified at trial that Joniah's head injuries consisted of both a newer, or acute, brain hemorrhage and an older, or chronic, brain hemorrhage. (R.R. 4: 165-67). The pattern of diffuse, or all-over, brain injury that Joniah exhibited could not, according to Dr. Cox, have been caused by his rolling off the bed or hitting his head — even several times — on a plastic baby tub. (R.R. 4: 169-73). Instead, Joniah's brain injury was consistent with a "severe

9

and violent traumatic event." (R.R. 4: 169). Dr. Cox testified that Joniah also had extensive retinal hemorrhaging as well as retinal detachment, both of which are hallmarks of the most severe and forceful type of traumatic event. (R.R. 4: 207-08, 212-13). Ultimately, Dr. Cox concluded that Joniah had suffered at least two distinct traumatic episodes, at least ten days apart, with the second episode occurring on the day he was brought to the hospital. (R.R. 4: 166-67, 173-74, 181-82).

Upon examining Joniah's skin, Dr. Cox determined that the multiple linear marks previously thought to be scratches or abrasions were actually burns. (R.R. 4: 163-64, 173). The overlying skin was gone on some of the marks — which Dr. Cox observed on the palm of one of Joniah's hands and on his buttocks, abdomen, thighs, and calves — and others had formed blisters. (R.R. 4: 163, 179).

Dr. Cox told Detective Slade about the burns on the morning of December 9. (R.R. 4: 96, 105, 202). After obtaining consent from Tamika, Detective Slade went back to the house to see if he could find whatever it was that had caused Joniah's "branding iron type" burns. (R.R. 4: 96). In the master bedroom, where appellant said he had spent most of the day with Joniah, Detective Slade noticed a radiator-style space heater with six, evenly spaced, vertical bars. (R.R. 3: 35-36; R.R. 4: 97, 123; R.R. 6: 7; R.R. 7: SX-2).

He plugged the heater in, and it became extremely hot after just a few seconds. (R.R. 4: 97). Detective Slade confiscated the heater, and subsequent DNA analysis detected low-level amounts of DNA on it. (R.R. 4: 97, 140, 142-43). Both appellant and Joniah were found to be possible contributors of this DNA. (R.R. 4: 142).

**F.  Joniah dies two days after he is brought to the hospital.**

Joniah never regained consciousness, and further testing confirmed that he had no brain activity. (R.R. 3: 57; R.R. 4: 163). On the afternoon of December 9, 2011, less than three weeks before his first birthday, Joniah was declared brain dead. (R.R. 3: 58; R.R. 6: 102; R.R. 7: SX-17). Tamika agreed to donate Joniah's organs, so he was continued on life support until the following day. (R.R. 3: 58; R.R. 6: 102-03; R.R. 7: SX-17).

**G.  An autopsy reveals the full extent of Joniah's injuries.**

Dr. Stephanie Burton, a forensic pathologist with the Dallas County Medical Examiner's Office, performed Joniah's autopsy on December 11, 2011. (R.R. 3: 188-89, 192; R.R. 6: 102; R.R. 7: SX-17). In her autopsy report and in her testimony at trial, Dr. Burton described the many external injuries that she observed on Joniah:

- two contusions on the back of his head;
- two linear, parallel burns on the back of his head;

- an abrasion on his left upper neck;

- two small abrasions on his chest;

- a linear burn on his abdomen;

- two linear, parallel burns on his back;

- two linear, parallel burns on his left buttock;

- two linear, parallel burns on the palm of his right hand;

- three circular-to-oval burns on the back of his right hand;

- two linear, parallel burns on the front of his right thigh;

- two sets of linear, parallel burns — four total — on the back of his right lower leg;

- a circular burn on the back of his right lower leg;

- two sets of linear, parallel burns — four total — on the front of his left thigh;

- two linear, parallel burns on the back of his left lower leg;

- two paired, curvilinear-patterned contusions on his right heel; and

- two paired, curvilinear-patterned contusions on his left heel.

(R.R. 3: 196-201, 203; R.R. 7: SX-17). In all, Dr. Burton observed a total of 26 thermal burns on Joniah's body, all of which were partial to full thickness. (R.R. 3: 199-200; R.R. 4: 42). The paired, linear, parallel burns were about one and three-fourths inches apart from midline to midline, which Dr. Burton later determined was consistent with the distance between the vertical heating

12

elements on the portable radiator seized from appellant's house. (R.R. 3: 201-02; R.R. 7: SX-17). Dr. Burton testified that the pattern of the contusions on Joniah's heels was "very suspicious-looking for a bite mark." (R.R. 3: 203).

Dr. Burton's internal examination of Joniah revealed the following injuries:

- three areas of hemorrhage underneath the scalp on the back of his head;

- severe cerebral edema, or swelling of his brain;

- an acute subdural hemorrhage over the top of his brain;

- an acute subdural hemorrhage over the base of his brain;

- an acute subarachnoid hemorrhage that was diffused over the top and bottom of his brain;

- a chronic subdural hemorrhage;

- diffuse retinal hemorrhages;

- a detached retina in his left eye;

- an area of subcutaneous hemorrhage underlying the abrasions on his chest;

- an acute posterior rib fracture;

- a healing posterior rib fracture;

- a subcutaneous contusion adjacent to the burns on his back;

- a subcutaneous contusion on his right lower back and buttock; and

13

- a subcutaneous contusion on his left buttock.

(R.R. 3: 204-19; R.R. 7: SX-17). Dr. Burton testified that there were three different impact sites on Joniah's head. (R.R. 3: 211-12). She stated that the acute bleeding in his brain was significant and would have caused an "immediate change" in his consciousness as well as "probable seizure activity." (R.R. 3: 216-18). This was in contrast to the older subdural hemorrhage, which was less diffuse and significantly smaller, although it might still have caused symptoms such as vomiting and changes in appetite and sleep patterns. (R.R. 4: 38, 40). According to Dr. Burton, neither the older nor the newer hemorrhage was consistent with a fall from a bed two feet off the ground. (R.R. 3: 220-21; R.R. 4: 39). Regarding the acute hemorrhage, Dr. Burton testified that it was "indicative of acceleration-deceleration injury," such as what would have occurred if the baby had been moved very quickly and then slammed into a hard object. (R.R. 3: 119-20, 227).

Dr. Burton concluded that Joniah died as a result of a closed-head injury, with the thermal injuries a contributing factor, and that the manner of his death was homicide. (R.R. 3: 221).

### H. An expert witness testifies for the defense that Joniah's death was caused by complications from a prior injury.

Dr. Janice Ophoven, a pediatric forensic pathologist, was hired by the defense to provide a second opinion as to the cause of Joniah's death. (R.R. 5:

14

49-52, 59). After reviewing all the medical records and forensic reports, Dr. Ophoven concluded that Joniah suffered from complications of a chronic subdural hematoma that occurred months prior to his death. (R.R. 5: 63-65). She testified that this chronic subdural hematoma was caused by some sort of blunt-force trauma to the head and that the resulting condition was, in her words, a "time bomb." (R.R. 5: 78, 127, 135, 144). She described how she believed the earlier injury ultimately led to Joniah's death:

> He then suffered subsequent impacts in the days prior to his collapse. And on the date of his collapse suffered sudden irreversible increased intercranial pressure, subdural bleeding. And that pressure and bleeding, the lack of balance in his head that started sometime in the past resulted in cardiac arrest on the . . . 7th or on that Wednesday.

(R.R. 5: 65).

According to Dr. Ophoven, the violent impact that set these events into motion likely occurred sometime in July 2011. (R.R. 5: 65, 135, 144, 156). She made this determination after reviewing Joniah's medical records and plotting his growth from the time of his birth until his death. (R.R. 5: 68; R.R. 7: DX-2). She testified that, in her opinion, Joniah experienced a "catastrophic change in his growth" starting at seven months of age, when he stopped gaining weight and began exhibiting symptoms such as frequent vomiting, lethargy, and irritability. (R.R. 5: 68, 72-73, 77-80). These symptoms,

15

according to Dr. Ophoven, were the result of increased intercranial pressure caused by the chronic subdural hematoma. (R.R. 5: 79-81).

Dr. Ophoven disagreed with Dr. Burton's assessment that Joniah suffered an acute traumatic head injury on the day he was brought to the hospital. (R.R. 5: 89). Specifically, Dr. Ophoven attributed much of the acute brain hemorrhage noted by Dr. Burton to the consequences of brain death or "respirator brain." (R.R. 5: 116-17). She testified that there was also some re-bleeding from the chronic subdural hematoma. (R.R. 5: 109-10). Regarding the three contusions on Joniah's head, Dr. Ophoven testified that none was "big enough or serious enough" to permit the conclusion that it resulted from a violent impact. (R.R. 5: 119, 139). She testified that the contusions could have been caused by a fall from a short distance or they could have simply been "little baby bumps," a common occurrence for an active 11-month-old. (R.R. 5: 119). Moreover, the contusions appeared to Dr. Ophoven to be of different ages. (R.R. 5: 119). Additionally, Dr. Ophoven testified that retinal hemorrhage alone is not an indicator of trauma. (R.R. 5: 120-22, 143-33).

Dr. Ophoven testified that without any significant impact injury to the head or trauma to the brain itself, she could not conclude that Joniah was the victim of a "fresh assault" on the day he went into cardiac arrest. (R.R. 5: 128-29, 139, 147-48). Ultimately, according to Dr. Ophoven, it could have been

16

something as seemingly mild as Joniah's hitting his head on the tub while taking a bath that triggered his collapse. (R.R. 5: 140, 156).

Dr. Ophoven also disagreed with the conclusions of both Dr. Burton and Dr. Cox that all of Joniah's skin injuries were burns. (R.R. 5: 89). Although she agreed that the parallel marks on the palm of Joniah's right hand were indeed thermal injuries, she testified that, in her opinion, the rest of the marks were "most consistent with deep abrasions or gouging," such as by a fingernail. (R.R. 5: 99, 101). Dr. Ophoven also testified that the intravenous fluids that caused Joniah's body to swell while he was in the hospital would have also caused the wounds on his skin to "spread apart more." (R.R. 5: 98). Addressing Joniah's chest injuries, Dr. Ophoven attributed the abrasions and soft-tissue injury to the compressions from CPR. (R.R. 5: 106-07). Although she acknowledged that the rib fractures could not have been caused by CPR, she testified that they could have "theoretically" been caused by a fall from a bed. (R.R. 5: 136, 154).

## I. Appellant's sister-in-law testifies in support of the defense theory that Joniah's injuries occurred prior to December 7, 2011.

Yolanda Monroe was married to appellant's brother. (R.R. 6: 113-14). She described appellant as a good father, who was affectionate and playful with Joniah. (R.R. 6: 121). She testified that a week or two before Joniah's death, Tamika told her that Joniah had fallen off the bed and burned his hand

17

on the portable heater. (R.R. 6: 116). Monroe said that she saw the resulting burns on Joniah's hand and that they looked "[l]ike lines or something." (R.R. 6: 116). Monroe also claimed that when Joniah was eight or nine months old and "pulling up on everything," she saw him bump his head on the coffee table and get a "knot" on his forehead. (R.R. 6: 117).

Monroe testified that she observed a change in Joniah's behavior when she had him over for a weekend visit about a month before he died. (R.R. 6: 117-18). She recalled that the normally playful Joniah was withdrawn, cried a lot, and slept more than he used to. (R.R. 6: 118). She also recalled that Joniah didn't want to be picked up and that he "just didn't like being bothered anymore." (R.R. 6: 118). He also seemed to be disturbed by loud noises, such as the barking of Monroe's dog. (R.R. 6: 119).

### J. A second medical examiner who was present during Joniah's autopsy disagrees with the opinions of the defense expert.

Dr. Reade Quinton, the soon-to-be deputy chief medical examiner for Dallas County, testified that he observed Joniah's autopsy and concluded, like Dr. Burton, that the marks on the baby's skin were burns. (R.R. 6: 35-39). Dr. Quinton also agreed with Dr. Burton's conclusions regarding the cause and manner of Joniah's death. (R.R. 6: 45). In Dr. Quinton's opinion, the older subdural bleed had nothing to do with Joniah's death. (R.R. 6: 44-45). Dr.

18

Quinton explained that a five-month-old, healed subdural is simply not capable of causing death:

> First of all, I guess the main point is that a subdural, if it was that old, has well healed. This is something that has scarred over. It's done. There's nothing left to kill you with mechanically. My argument would be how do you think mechanically this old injury would kill you?
>
> The answer is I can't come up with one. The analogy I would use is if you had something that old, that it's like a scar. You can see it microscopically. It's there. But if you cut your hand within the first few days after you cut it when it's got a scab on it then obviously you could split that again. It could re-bleed. You could have complications.
>
> If you had a cut on your hand and four months later it's just a scar, it's not going to spontaneously explode. It doesn't do that. Scars don't do that.

(R.R. 6: 42-43). Dr. Quinton also testified that there are many possible explanations for a child's failure to gain weight — or "failure to thrive" — and that environmental factors are often to blame. (R.R. 6: 51-52). Specifically, Dr. Quinton pointed to neglect as a common cause of failure to thrive. (R.R. 6: 51-52).

Dr. Quinton testified that the newer blood observed on Joniah's brain was not re-bleeding from the chronic subdural; it was, instead, indicative of a separate and distinct traumatic event. (R.R. 6: 43-44, 74). He noted that there were multiple points of impact underneath Joniah's scalp. (R.R. 6: 41-42, 94). He also testified that there was no correlation between the size of the bruising

on Joniah's scalp and the severity of the underlying injury or the amount of force inflicted. (R.R. 6: 41-42). He stated that it was "highly unlikely" that Joniah's new subdural bleed was caused by a fall from a bed two feet off the ground, but he acknowledged that "there are times a child could fall the right way in certain situations and sustain a lethal head injury." (R.R. 6: 46-47). He also acknowledged that a baby with a prior subdural hematoma might be more susceptible to increased injury from future head trauma. (R.R. 6: 97). In the end, however, it was the "totality of the scene" that led Dr. Quinton to conclude that what had happened to Joniah was a homicide:

> Again we are not looking at one injury. We're looking at multiple injuries. We're looking at multiple events. To say that — this is a child who supposedly was eating, sleeping, doing all these things and then suddenly is unresponsive and somewhere in that time frame we gained burns, bites, other things, can I say beyond a shadow of a doubt that those bruises occurred at that point? No. Could be days prior.
>
> This kid clearly has had multiple injuries. We have old rib fractures, newer rib fractures, all these things. It's a chronically abused and tortured child really when you talk about burns. Take it as you will. It is what it is.

(R.R. 6: 107-08).

## SUMMARY OF ARGUMENT

*Response to First Issue:* The evidence is legally sufficient to support appellant's capital-murder conviction. Based on the evidence showing that

20

Joniah suffered his fatal injuries while he was in appellant's sole care, that the injuries could not have resulted from a routine household accident, and that appellant gave inconsistent and implausible stories to investigators, a rational juror could have reasonably inferred that appellant caused the baby's death. Additionally, a rational juror could have considered the evidence about the extent and severity of Joniah's injuries as proof that appellant was, at the very least, aware that his actions were reasonably certain to result in the baby's death.

*Response to Second and Third Issues:* The trial court did not err in permitting a witness to testify whose name the State did not include on its witness list at least 30 days prior to trial, as required by the court's discovery order. Nothing indicates that the State acted in bad faith by not disclosing the witness's name until the week prior to trial, when the State learned of the unavailability of the witnesses it had intended to call to testify to the same matters as the undisclosed witness. Moreover, the name of the witness, an emergency-room physician who treated Joniah when he was brought to the hospital, appeared in the medical records provided to the defense more than a year before trial. Accordingly, appellant could have reasonably anticipated that the State would call the witness to testify.

21

# ARGUMENT

## RESPONSE TO ISSUE ONE

## The evidence is legally sufficient to prove that appellant intentionally or knowingly caused the victim's death.

In his first issue, appellant contends that the evidence is legally insufficient to support his conviction. He specifically challenges the sufficiency of the evidence to prove that (1) he caused the victim's death and (2) he did so intentionally or knowingly.

### A. A legal-sufficiency review assesses the rationality of the jury's verdict.

In evaluating the legal sufficiency of the evidence to support a conviction, the reviewing court considers all the evidence in the light most favorable to the verdict and determines whether, based on that evidence and all reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). The reviewing court's role is not to become a "thirteenth juror"; the court may not reevaluate the weight and credibility of the evidence and thereby substitute its judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, the appellate court must defer to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to

22

weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13 (citing *Jackson*, 443 U.S. at 318-19). The appellate court's role is "restricted to guarding against the rare occurrence when a factfinder does not act rationally." *Laster v. State*, 275 S.W.3d 512, 517-18 (Tex. Crim. App. 2009).

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to support a conviction. *Id.* Thus, the legal-sufficiency standard of review is the same for both direct and circumstantial-evidence cases. *Id.* The State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Rather, the reviewing court should consider only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Id.*

### B. Capital murder requires proof of causation and an intentional or knowing act.

A person commits the offense of capital murder if he intentionally or knowingly causes the death of an individual under ten years of age. Tex. Penal Code Ann. § 19.02(b)(1) (West 2011), § 19.03(a)(8). Here, the indictment alleged that appellant intentionally or knowingly caused Joniah's death by

23

striking Joniah with appellant's hand or by striking Joniah "with and against an unknown object." (C.R.: 8).

Capital murder is a result-of-conduct offense. *Louis v. State*, 393 S.W.3d 246, 251 (Tex. Crim. App. 2012). A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. Tex. Penal Code Ann. § 6.03(a) (West 2011). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). A person is criminally responsible for causing a result if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the results and the conduct of the actor clearly insufficient. *Id.* § 6.04(a).

### C. The evidence is legally sufficient to prove that appellant caused Joniah's death.

Appellant argues that the State failed to prove that he was responsible for Joniah's death because there was "no evidence as to when [Joniah] allegedly suffered trauma to his head." (Appellant's Brief, p. 43). He also argues that the State failed to rebut the possibility that Joniah's fatal head injury occurred months prior to his death.

24

### 1. *Joniah sustained his injuries after he was left alone with appellant.*

Texas case law is replete with holdings that when an adult defendant had sole access to a child at the time the child was injured, the evidence is sufficient to support a conviction for injury to child or, if the child dies, for murder. *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd); *see Cuadros–Fernandez v. State*, 316 S.W.3d 645, 654 (Tex. App.—Dallas 2009, no pet.). In the instant case, Tamika testified that Joniah was fine when she left him in appellant's care on the morning of December 7, 2011. (R.R. 3: 39-40). She stated that there was nothing unusual about his behavior the previous day, either, and recalled that he was eating, drinking, and crawling around normally. (R.R. 3: 34-35). She testified that she gave Joniah a bath on the evening of December 6 and that she did not see any burns, bite marks, or unusual bruising on his body at that time. (R.R. 3: 34-35, 129). During his interviews with Detectives Slade and Van, appellant was asked several times if anyone else had been in the house while Tamika was at work on December 7. (R.R. 4: 95-96). Appellant confirmed that he was home alone with Joniah all day. (R.R. 4: 96; R.R. 5: 39).

Tamika described the marks she saw on Joniah's body in the hospital as "horrifying" and unlike anything she had ever seen before on her child, who she acknowledged suffered from eczema and would sometimes scratch himself.

25

(R.R. 3: 90-92, 113). She testified that Joniah never played near the space heater and that she had never seen him touch it. (R.R. 3: 75). She also testified that although she would sometimes playfully bite her son's heels to make him laugh, she had never bit him hard enough to leave a mark with "teeth holes," such as the ones Joniah had on his heels when she saw him in the hospital. (R.R. 3: 103, 118, 127-28). Additionally, there was evidence that Joniah had been to the pediatrician just two days before his hospitalization. (R.R. 3: 30-31, 62). The wounds on his skin, photographs of which were admitted into evidence at trial, would have been obvious during even the most cursory medical examination. (R.R. 7: SX-7, -8, -9, -10, -11, -12, -13, -14, -15). And yet, the doctor did not see anything concerning and pronounced Joniah a "healthy baby" at that visit. (R.R. 4: 31; R.R. 5: 25).

Both Dr. Cox and Dr. Burton testified that Joniah's fatal head injury would have rendered him immediately symptomatic. (R.R. 3: 217-18; R.R. 4: 40; R.R. 4: 167-68). According to Dr. Cox, the newer bleeding observed in Joniah's brain would have been a "that day type injury based on his clinical presentation," which included altered breathing and muscle tone. (R.R. 4: 167). He also testified that Joniah "would be acting differently immediately after a traumatic event of the severity that [he] would have had to sustain to cause his injuries." (R.R. 4: 167). Dr. Burton testified that the acute bleeding

26

in Joniah's brain would have caused an "immediate change in the child's consciousness," as well as "probable seizure activity." (R.R. 3: 217-18). She stated that Joniah would not have been able to eat or drink normally after sustaining such an injury. (R.R. 3: 218).

The evidence, viewed in the light most favorable to the verdict, shows that Joniah was alive and not visibly injured before being left in appellant's sole care on the morning of December 7. After approximately nine hours alone with appellant, Joniah was brought to the hospital, where he was essentially dead on arrival, with a severe brain injury and with multiple external injuries, including 26 burns all over his body. (R.R. 3: 161, 200, 202-03, 216-17; R.R. 4: 42; R.R. 5: 66). From this evidence, the jury could have rationally concluded that Joniah sustained his injuries, including his fatal head injury, while he was in appellant's sole care. *See, e.g., Cuadros-Fernandez*, 316 S.W.3d at 654 (holding that the evidence was sufficient to support the defendant's conviction for capital murder of a child where the child was fine before being left with the defendant, and the defendant was alone with the child for at least two hours before the child collapsed).

### 2. Appellant's various accounts of the events of that day did not explain the severity of Joniah's injuries.

In addition to the evidence showing that appellant was the only adult with access to Joniah at the time the injuries were inflicted, the jury was also entitled to consider, as further evidence of appellant's guilt, his shifting versions of events and the inconsistencies between his explanations for Joniah's injuries and the medical evidence. *See, e.g.*, *Kemmerer v. State*, 113 S.W.3d 513, 515-16 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). At the hospital, appellant told the emergency-room physician, Dr. Nesiama, that Joniah had woken up sick that morning and had not been "acting like himself" all day. (R.R. 3: 171-72). But he later told Detective Slade that Joniah was fine when Tamika went to work that morning. (R.R. 4: 95). Tamika also testified that Joniah was fine when she saw him that morning and that appellant did not report any concerns to her when she called to check in. (R.R. 3: 40-43).

During his interview with Detective Slade, appellant claimed that Joniah had gone "limp" in his arms while he was giving him bath. (R.R. 4: 79, 87). But he also claimed that Joniah was "fighting him" during the bath and "wiggling around." (R.R. 4: 87). To explain the bite marks on Joniah's heels, appellant told Detective Slade that Joniah was kicking his legs while appellant

28

was trying to get him dressed, and that he had to hold the baby's feet with his teeth in order to put his pants on. (R.R. 4: 87-88). Detective Slade testified that appellant's explanation made no sense "because the child had already gone limp in his arms" and because it would have been impossible for appellant to put pants over the baby's legs while simultaneously holding the baby's feet in his mouth. (R.R. 4: 88; R.R. 5: 39-40). At another point in the interview, appellant contradicted his story about Joniah's fighting his efforts to put pants on and claimed that while Joniah would normally resist getting dressed, this time he was "just laying there." (R.R. 4: 130-32; R.R. 5: 36-37, 39-40).

During his interview with Detective Van, appellant for the first time admitted to being frustrated with Joniah and to shaking him, although he claimed that he had done so gently and only in an effort to calm the baby down. (R.R. 4: 91, 93-94, 103-04). Appellant told Detective Van that he had attended a "shaken baby class" and knew "that you can't shake a baby with your arms fully extended because that's when children get hurt." (R.R. 4: 91-92). According to Detective Slade, appellant could not provide a chronological sequence of events and revised his story as he was confronted about Joniah's specific injuries. (R.R. 4: 135; R.R. 5: 41-42). The jury was entitled to regard appellant's different versions of events as evidence of his

consciousness of guilt and to conclude that appellant changed his stories because he had something to hide. *See Montgomery v. State*, 198 S.W.3d 67, 87 (Tex. App.—Fort Worth 2006, pet. ref'd).

Moreover, in light of the medical evidence presented at trial about the nature and extent of Joniah's injuries, the jury could have reasonably and rationally rejected each of appellant's various accounts as not credible. The only explanations that appellant ultimately gave for Joniah's injuries were that the baby had recently rolled off the bed twice, that he might have accidentally scratched the baby with his fingernails, that the baby might have bumped his head on the plastic bathtub, and that he had shaken the baby gently. But the State's experts testified that Joniah was not scratched but severely burned — 26 times on his head, abdomen, back, hand, and legs — and that the distinctive pattern of the majority of the burns suggested that they had been inflicted by the portable radiator in appellant's bedroom. (R.R. 3: 196-203; R.R. 4: 163-64, 211; R.R. 6: 39-40). The State's experts also testified that Joniah's fatal brain injury was caused by blunt-force trauma of a severe and violent nature, such as the baby's having been put in rapid motion and then slammed into a hard object. (R.R. 3: 219-20, 226-27; R.R. 4: 169, 175; R.R. 6: 92-94, 103, 105). The jury was entitled to regard the implausibility of appellant's explanations for Joniah's injuries as additional evidence of his guilt. *See, e.g., Guevara v.*

*State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (holding that "inconsistent statements . . . and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt").

### 3. The jury was entitled to reject the defense's theories about the cause of Joniah's death and the nature of his skin injuries.

Appellant argues that the State failed to rebut what he contends are the "alternative reasonable hypotheses" in this case: that the marks on Joniah's skin were actually fingernail scratches — accidentally inflicted while he was giving the baby a bath — and that Joniah's death was actually caused by a head injury sustained months prior — in July 2011, to be exact. (Appellant's Brief, p. 44, 51-57). But the State was not required, at trial, to affirmatively disprove every reasonable alternative hypothesis that was inconsistent with appellant's guilt. *See Wise*, 364 S.W.3d at 900; *Laster*, 275 S.W.3d at 520. Nor is this Court, in reviewing the sufficiency of the evidence to support appellant's conviction, required to determine whether the evidence excluded every reasonable hypothesis other than his guilt. *See Laster*, 275 S.W.3d at 520-21; *see also Geesa v. State*, 820 S.W.3d 154, 155 (Tex. Crim. App. 1991) (abandoning the "reasonable hypothesis analytic construct" for circumstantial-evidence cases), *overruled, in part, on other grounds by Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000). Indeed, for this Court to do so would place it in the

31

improper position of a thirteenth juror, "thereby repudiating the jury's prerogative to weigh the evidence, to judge the credibility of witnesses, and to choose between conflicting theories of the case." *Merritt v. State*, 368 S.W.3d 516, 527 (Tex. Crim. App. 2012).

Moreover, there was no dispute at trial that Joniah had sustained a previous head injury. On this point, each of the State's medical experts agreed with the defense's expert, Dr. Ophoven, that there was evidence of prior blunt-force trauma to Joniah's head. (R.R. 3: 217; R.R. 4: 38-39, 166-67, 169-70, 173-74; R.R. 5: 64-65, 135; R.R. 6: 44-45, 73). Indeed, Joniah also had rib fractures in various stages of healing — further evidence that he was, as Dr. Quinton stated, a "chronically abused" child. (R.R. 3: 207-08; R.R. 4: 39; R.R. 6: 107-08). The State's experts also agreed that the prior head injury could have occurred several months before Joniah's death. (R.R. 4: 166-67, 181-82; R.R. 6: 44, 73). Where they disagreed with Dr. Ophoven was as to her theory that a five-month-old subdural hemorrhage, which had completely healed, could have spontaneously re-bled and resulted in Joniah's collapse and ultimate death. (R.R. 4: 58-60, 174, 215; R.R. 6: 42-45). Dr. Quinton testified that he had never seen such a scenario reported in any forensic literature and that, in his opinion, it was not possible. (R.R. 6: 74-75). Dr. Burton testified that an old subdural hemorrhage might bleed microscopically, "but they do not

32

produce large subdural hemorrhages or when they do re-bleed, it's such little blood, it does not cause loss of consciousness." (R.R. 3: 58). She also testified that "respirator brain" does not cause acute bleeding in the brain. (R.R. 4: 60).

Furthermore, although Dr. Ophoven attributed Joniah's failure to gain weight after seven months of age to increased intercranial pressure from the initial head trauma, she failed to consider other possible reasons for Joniah's "failure to thrive." She admitted that she was not aware that the baby's health problems started around the time — after Tamika had gone back to work and appellant's mother had moved out of the house — that appellant became the child's primary caregiver. (R.R. 3: 22-23, 114-15; R.R. 5: 134-35). Dr. Quinton testified that in determining the cause of failure to thrive, he would first look to environmental factors: "Has something in the environment changed, being they changed the way that the baby was fed, the routine of the baby, something like that." (R.R. 6: 51). He testified that in many instances, failure to thrive "can be just from neglect. They are not getting enough intake or the correct kind of intake." (R.R. 6: 51-52).

Here, three medical doctors, including the pathologist who performed Joniah's autopsy, testified that Joniah's fatal injury was his acute brain hemorrhage and that this hemorrhage was caused by a severe and violent traumatic event that occurred on December 7, the day he was brought to the

33

hospital. (R.R. 3: 215-17, 219-20, 226-27; R.R. 4: 28-29, 38, 40, 57-58, 166-69, 171-72, 174; R.R. 6: 43-44, 46-47, 73-74, 92-95, 105). The State's experts also testified that Joniah's head injury was intentionally inflicted — and not the result of a routine household accident, such as a fall from the bed or a bump on the bathtub — and would have caused immediate, severe, and unmistakable symptoms. (R.R. 3: 217-23, 226-27; R.R. 4: 167-69, 172-74, 176, 185, 205; R.R. 6: 46-47, 92-93, 103, 105, 107). The jury could have rationally concluded that the only person who could have inflicted this injury was the person who was alone with Joniah when he collapsed — appellant. *Cf. Martin v. State*, 246 S.W.3d 246, 262 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding that the evidence was legally sufficient to prove that the defendant caused the child's fatal injuries where the medical evidence showed that the child would have been immediately and severely symptomatic upon sustaining the injuries, and the defendant was the only one who had contact with the child during the time frame in which the injuries could have occurred).

In arguing that the evidence is insufficient to show that Joniah's head injury was the result of abuse, appellant discounts the significance of the baby's skin injuries, claiming that it is "absurd" that the State's medical experts concluded that all of the linear marks were burns. (Appellant's Brief, p. 49). He argues that, with the exception of the ones on Joniah's palm, it is "much

34

more likely" that the marks were scratches, caused by his "unusually long fingernails." (Appellant's Brief, p. 49, 51). He points out that Joniah's DNA was found in his fingernail scrapings. (R.R. 4: 140-41). He also points out that he was not normally the one who bathed Joniah — indeed, Tamika testified that he had only done so once before, when Joniah was about a week old — and argues that it was that his inexperience with holding a slippery baby in the bathtub that led to the scratches. (R.R. 3: 34). But all three of the State's experts, each of whom saw the injuries firsthand, testified that the marks on Joniah's skin were definitely burns and not scratches. (R.R. 3: 196-203; R.R. 4: 163-64, 177-78, 211, 221; R.R. 6: 39-40, 103, 109). Even the defense's expert witness described the linear marks as "deep scratches," "gouges," "full thickness abrasions," and "incision[s]." (R.R. 5: 94-95, 97, 102, 106). She also acknowledged that the marks on the back of Joniah's head were consistent with burns. (R.R. 5: 137-38). The jurors viewed photographs of the skin injuries, as well as photographs of appellant's fingernails, and could have reasonably concluded — relying on their own common sense and the testimony of the State's experts — that the 26 marks all over Joniah's body were not accidental fingernail scratches but were, instead, further proof of the abuse that appellant inflicted on Joniah prior to the baby's death. (R.R. 7: SX-7, -8, -9, -10, -11, -12, -13, -14, -15; DX-7, -8, -9, -10).

Viewing all the evidence in this case in the light most favorable to the prosecution, any rational juror could have found, beyond a reasonable doubt, that appellant was the person who inflicted Joniah's fatal head injury. Accordingly, the evidence is legally sufficient to prove that appellant caused Joniah's death.

**D. The evidence is legally sufficient to prove that appellant acted intentionally or knowingly.**

The evidence is also legally sufficient to support the jury's finding that, in causing Joniah's death, appellant acted intentionally or knowingly. Mental culpability must generally be inferred from the circumstances under which a prohibited act occurs. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991). The requisite mental state to commit capital murder can be inferred from the acts, words, and conduct of the accused; the extent of the victim's injuries; the method used to produce the injuries; and the relative size and strength of the parties. *Martin*, 246 S.W.3d at 263 (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App.1995)). Evidence of a particularly brutal or ferocious mechanism of death, inflicted upon a helpless victim, can be controlling on the issue of intent or knowledge. *Id.*

In a sufficiency review, the reviewing court affords the jury's inference of culpable intent as much deference as it does to the evidence supporting proof of culpable conduct. *Isassi*, 330 S.W.3d at 643. As long as the jury's finding of

a culpable intent is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable. *Id.*

Appellant relies on *Louis v. State*, 393 S.W.3d 246 (Tex. Crim. App. 2012), to support his argument that the evidence is insufficient to prove that he caused Joniah's death intentionally or knowingly. In *Louis*, the Court of Criminal Appeals held that the evidence was legally insufficient to establish that the defendant intended to cause the death of his girlfriend's two-year-old son because, although the defendant admitted to striking the child repeatedly with a leather belt on the thighs, buttocks, and back, the evidence showed that the child's mother continued to abuse the child after the defendant had left the house. 393 S.W.3d at 251. The Court pointed out that the child's death was caused by a combination of the defendant's and the mother's acts, and there was no evidence that the defendant knew that, after he left the house, the mother would repeatedly strike the child's head and hang him by his arms in a closet. *Id.* at 251-52. The Court held that, in the absence of any evidence showing that the child could or would have died from the injuries caused by the defendant alone, the jury could not have reasonably inferred that the defendant intended to cause the child's death. *Id.* at 252.

Appellant contends that "[t]he evidence of possible abuse committed by the defendant against the child in *Louis* is far more compelling than the

37

evidence presented against Appellant." (Appellant's Brief, p. 46). But what prompted the Court of Criminal Appeals to hold, in *Louis*, that the evidence was insufficient to establish the requisite culpable mental state for capital murder was the fact that the injuries inflicted by the defendant were not fatal in and of themselves but became fatal only in combination with later injuries separately inflicted by the child's mother. 393 S.W.3d at 252. *Louis* has no application to the present case. Here, the evidence, viewed in the light most favorable to the jury's verdict, shows that appellant was the only person responsible for Joniah's death.

Furthermore, the jury could have reasonably inferred, from the extent and severity of the injuries, that appellant acted at least knowingly when he caused Joniah's death. Dr. Cox testified that Joniah's brain injury was "extensive" and could only have been caused by a "severe and violent traumatic force." (R.R. 4: 169, 213). He also testified that Joniah had "extensive and diffuse" retinal hemorrhages as well as retinal detachment, both of which "are things seen in the most severe traumatic event." (R.R. 4: 207-08). Dr. Cox likened Joniah's injuries to those he might see in a child who had been in a car accident, who had fallen out of a third-story window, or who had endured some other type "extreme trauma." (R.R. 4: 169, 220).

Dr. Burton testified that Joniah had three different impact sites on his head, that he had bleeding all over his brain, and that the pattern of his injuries was not consistent with a short fall, such as from a bed. (R.R. 3: 212, 216-17, 219-21, 226; R.R. 4: 56-58; R.R. 7: SX-18). Rather, she testified, it was consistent with an "acceleration-deceleration injury," where the child was put into motion and then slammed into a hard object. (R.R. 3: 219-20, 227).

A rational jury could have concluded, beyond a reasonable doubt, that an adult male who strikes an 11-month-old, approximately 22-pound baby in the head with the amount of force that was required to cause the injuries that Joniah sustained would, at the very least, have been aware that his conduct was reasonably certain to result in the child's death. (R.R. 5: 93; R.R. 7: SX-17; DX-2). *See* Tex. Penal Code Ann. § 6.03(b); *cf. Montgomery*, 198 S.W.3d at 87-88 (holding, after considering the extent of the child's injuries, the amount of force that would have been required to cause those injuries, and the disparities in size and strength between a 16-month-child and a grown man, that the evidence was legally sufficient to prove that the defendant acted at least knowingly in causing the child's death). The evidence is legally sufficient to support appellant's conviction. His first issue should be overruled.

**RESPONSE TO ISSUES TWO AND THREE**

**Appellant failed to preserve his complaint that the trial court erred in allowing testimony from a witness whose name did not appear on the State's witness list at least 30 days prior to trial.**

In his second and third issues, appellant contends that the trial court erred in allowing the emergency-room physician, Dr. Nesiama, to testify because the State failed to provide timely notice of its intention to call her as a witness. He argues that the State violated the trial court's pretrial discovery order, which required the State to provide 30 days' notice of the identities of all of its witnesses, and that the trial court, by allowing Dr. Nesiama to testify, violated his Sixth Amendment right to confrontation and his right, under the First, Fifth, and Fourteenth Amendments, to a "neutral and impartial judge." (Appellant's Brief, p. 70).

**A. Appellant did not raise his constitutional claims at trial, and he failed to request a continuance to preserve his claim that he was not prepared for the witness's testimony.**

On May 27, 2014, prior to the start of voir dire, defense counsel addressed the trial court about a provision in counsel's "omnibus pretrial

motion"[1] that required the State to provide 30 days' notice of the witnesses it intended to call to testify:

> [DEFENSE COUNSEL]: Also on omnibus number 11 which you have there 30 days prior to trial, we were supposed to get notice of their identity and what they intend to testify about. We did not get notice until May 7th that an additional doctor Joni McClain was going to testify. We were not given any information about what she intends to testify about.
>
> [PROSECUTOR]: Take her off.
>
> [DEFENSE COUNSEL]: We were given notice on May 7th of Dr. Marita Thompson.
>
> THE COURT: Who does the State intend to call?
>
> [PROSECUTOR]: The experts are Dr. Burton and Dr. Matt Cox.
>
> . . . .
>
> [DEFENSE COUNSEL]: Both of those I have sufficient notice on.
>
> [PROSECUTOR]: I had put a Marita Thompson. I can't remember the other one.
>
> [DEFENSE COUNSEL]: Nesiama.
>
> [PROSECUTOR]: Thompson is now unavailable and there was another one Murphy became unavailable that I have — I let you know last week about Nesiama. I gave you her phone

---

[1] Neither this motion nor any orders associated with it appear in the record before this Court. The prosecutor did not, however, dispute defense counsel's representation that there was a pretrial order in place that required the State to give 30 days' notice of the witnesses it intended to call at trial. (R.R. 2: 18-21; R.R. 3: 151-53).

number. Quite frankly, most of what she's going to do is really fat [*sic*].

[DEFENSE COUNSEL]: With respect to Dr. Nesiama, I wasn't given notice of her until last Tuesday and, of course, that's not in compliance with the Court's pretrial orders. It really doesn't allow me the time —

THE COURT: Is she the treating physician at the ER?

[PROSECUTOR]: Yes.

[DEFENSE COUNSEL]: I didn't see her on the records. That was Dr. Marissa — Marita and Murphy.

[PROSECUTOR]: They got a lot of names on there. I admit that but she's one of the names that's on the ER doctor.

[DEFENSE COUNSEL]: We weren't given notice she was going to testify.

THE COURT: She's going to testify based on the same records that were submitted regarding the other ER doctors?

[PROSECUTOR]: Yes, Your Honor.

THE COURT: Your objection is overruled.

[DEFENSE COUNSEL]: We except to that, Your Honor. Is it the State's representation that Dr. Nesiama is going to testify to exactly the same records that were going to be testified to by — well, actually, Your Honor, none of the notices were given timely except for Dr. Cox and Tammy Robertson and Ikler (phonetic) who was the person who contacted the M.E.'s office. None of these experts were provided within 30 days of trial.

THE COURT: When did you receive the ER records?

. . . .

42

[DEFENSE COUNSEL]: Last year.

THE COURT: Your objection is overruled.

(R.R. 2: 18-21).

Prior to Dr. Nesiama's testimony, the trial court, at appellant's request, held a hearing outside the presence of the jury. (R.R. 2: 21; R.R. 3: 134-153). At this hearing, the State informed the trial court that it had previously tendered to the defense a CD containing the medical records that Dr. Nesiama was going to testify from. (R.R. 3: 134-35). The State also produced two binders full of printed material and represented to the trial court that all of the printed material was contained on the CD provided to the defense. (R.R. 3: 134-35). The parties were then permitted to question Dr. Nesiama about her qualifications and experience and the substance of her intended testimony. (R.R. 3: 136-47). At the conclusion of this questioning, the trial court ruled that he would "allow this witness to testify about the treatment, the injuries and to testify that the criteria was met for her to alert the social worker. But I'm not going to allow her to testify as to her opinion whether they were accidental or a result of abusive behavior." (R.R.3: 147). Defense counsel, reiterating that she had not received the required 30 days' notice of the State's intention to call Dr. Nesiama, made the following objection:

> So we would object that there — allowing this witness to testify
> violates the Court's pretrial orders upon which we relied in doing

43

our trial prep, thereby depriving my client of his constitutional Fifth and Sixth Amendment right to effective assistance of counsel. It violates the ruling this Court made in regard to omnibus number 11 in which the State was supposed to give 30 days['] notice, what they intend to testify about. And we object to her testimony on that basis.

(R.R. 3: 151-53). The trial court again asked defense counsel when she had received the CD containing the emergency-room records. (R.R. 3: 153). Counsel replied that she had received it "probably 12 to 18 months ago." (R.R. 3: 153). The trial court overruled the objection. (R.R.3: 153).

As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling sought with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. Tex. R. App. P. 33.1(a)(1)(A). It is well-settled that even constitutional claims are forfeited if not raised in the trial court. *See Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008).

Here, appellant objected at trial that allowing Dr. Nesiama to testify would be a violation of the trial court's discovery order and would deprive him of his constitutional right to the effective assistance of counsel. (R.R. 2: 19-20; R.R. 3: 151-53). Appellant never complained at trial, as he does on appeal, of a deprivation of his constitutional rights to confrontation or to a "neutral and

44

impartial judge." These complaints have not, therefore, been preserved for appellate review. *See* Tex. R. App. P. 33.1(a)(1)(A).

Moreover, although appellant claims that the late notice concerning Dr. Nesiama's testimony caused him to be unprepared for trial, he never asked the trial court for additional time to prepare for her testimony. (R.R. 2: 19-20; R.R. 3: 153). The proper procedure when alleging surprise due to a violation of a trial court's discovery order is to request a continuance. *Duff-Smith v. State*, 685 S.W.2d 26, 33 (Tex. Crim. App. 1985); *see Tamez v. State*, 205 S.W.3d 32, 40 (Tex. App.—Tyler 2006, no pet.). If a witness's name is not furnished to a defendant before trial despite a court order, any error in allowing that witness to testify over a claim of surprise is forfeited by the defendant's failure to move for a continuance. *See Barnes v. State*, 876 S.W.2d 316, 328 (Tex. Crim. App. 1994); *see also Oprean v. State*, 201 S.W.3d 724, 730 n.10 (Tex. Crim. App. 2006) (Cochran, J., concurring) (noting that, when there has been a violation of a discovery order, "the trial court may always exclude the undisclosed evidence, but if he does not, any error in causing "surprise" to the defense is forfeited on appeal unless the defendant has also requested a postponement or recess") (citing *Lindley v. State*, 635 S.W.2d 541, 544 (Tex. Crim. App. 1982)). Here, by failing to request a continuance, appellant forfeited his complaint that the trial court erred in allowing Dr. Nesiama to testify. *See, e.g., Sanders v.*

*State*, No. 05-12-01186-CR, 2014 Tex. App. LEXIS 4430, at *8-9 (Tex. App.—Dallas Apr. 23, 2014, pet. ref'd) (not designated for publication) (holding that any error in the trial court's allowing the State's expert witnesses to testify despite the State's failure to comply with the trial court's discovery order was forfeited where the defendant did not request a continuance). Appellant's second and third issues should be overruled.

## B. Even if appellant preserved his complaint, the trial court did not err in allowing the witness to testify.

Generally, notice of the witnesses that the State intends to call at trial must be given upon request by the defense. *Hamann v. State*, 428 S.W.3d 221, 227 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (citing *Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993)). A trial court's decision to allow a witness to testify who was not on the State's list is reviewed for an abuse of discretion. *Id.* Among the factors a reviewing court considers in determining whether the trial court abused its discretion are (1) whether the State's actions in calling a previously undisclosed witness constituted bad faith, and (2) whether the defense could have reasonably anticipated that the witness would testify. *Id.* at 227-28 (citing *Wood v. State*, 18 S.W.3d 642, 649 (Tex. Crim. App. 2000)). In determining whether the State acted in bad faith, the principal inquiry is whether the State intended to deceive the defense by withholding the

identity of the witness. *See id.* at 228 (citing *Nobles v. State*, 843 S.W.2d 503, 515 (Tex. Crim. App. 1992)).

Here, appellant does not point to any evidence suggesting that the State acted in bad faith by not disclosing Dr. Nesiama as a witness until the week before trial. The prosecutor stated that he informed defense counsel about Dr. Nesiama after the two other emergency-room physicians he had originally given notice of became unavailable to testify. (R.R. 2: 19-20). *Cf. Hamann*, 428 S.W.3d at 228 (holding that there was no evidence of bad faith in the State's failure to disclose the name of its fingerprint expert where the State had previously disclosed its plans to call such an expert). He also stated that he provided defense counsel with Dr. Nesiama's cell-phone number and that he told Dr. Nesiama to expect a call from defense counsel. (R.R. 2: 19; R.R. 3: 140-41, 152-53).

Furthermore, defense counsel acknowledged that she had received a copy of Joniah's emergency-room records at least a year prior to trial. (R.R. 2: 20-21; R.R. 3: 153). The prosecutor stated that Dr. Nesiama's name was included in those records. (R.R. 2: 20). Dr. Nesiama testified at the sub rosa hearing that she was one of Joniah's treating physicians in the emergency room and that she was involved in his initial resuscitation. (R.R. 3: 149-50). She also testified that she was the "charge physician" that day, responsible for

overseeing the entire emergency department. (R.R. 3: 149). Appellant could have reasonably anticipated that the State would call Dr. Nesiama to testify regarding Joniah's treatment.

Moreover, Dr. Nesiama's testimony that Joniah's injuries met the hospital's criteria for alerting a social worker was not the kind of expert testimony, assuming it was expert testimony at all, for which appellant would have needed "exceptional formal notice." (R.R. 3: 148, 170-73). *Tamez*, 205 S.W.3d at 39. Indeed, having been informed that the REACH physician, Dr. Cox, was going to testify as an expert in this case, appellant could have reasonably anticipated that the State would present testimony that Joniah's injuries led emergency-room doctors to suspect abuse. (R.R. 2: 19; R.R. 3: 152). Additionally, the trial court gave appellant the opportunity to question Dr. Nesiama before she testified, effectively remedying any surprise about the witness's identity. (R.R. 3: 140-51). *See Hamann*, 428 S.W.3d at 228.

The trial court did not abuse its discretion in allowing Dr. Nesiama to testify. Appellant's second and third issues should be overruled.

## **PRAYER**

The State prays that this Honorable Court affirm the trial court's judgment.

Respectfully submitted,

/s/ Johanna H. Kubalak

Susan Hawk
Criminal District Attorney
Dallas County, Texas

Johanna H. Kubalak
Assistant District Attorney
State Bar No. 24014297
Frank Crowley Courts Bldg.
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3639
(214) 653-3643 *fax*
Anna.Kubalak@dallascounty.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief, inclusive of all contents, is 12,513 words in length according to Microsoft Word 2010, which was used to prepare the brief, and complies with the word-count limit in the Texas Rules of Appellate Procedure. *See* Tex. R. App. P. 9.4(i).

/s/ Johanna H. Kubalak
Johanna H. Kubalak

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing State's brief was served on Michael Mowla, attorney for appellant, via electronic delivery to Michael@mowlalaw.com on February 18, 2015.

/s/ Johanna H. Kubalak
Johanna H. Kubalak

49